*In re* C.E. *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellee, v. Charity E., Respondent-Appellant).

First District (5th Division)   No. 1—10—0671

Opinion filed December 3, 2010.

Abishi C. Cunningham, Jr., Public Defender, of Chicago (George Dykes, Assistant Public Defender, of counsel), for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Nancy Grauer Kisicki, and Stacia D. Weber, Assistant State's Attorneys, of counsel), for the People.

Robert F. Harris, Public Guardian, of Chicago (Kass A. Plain and Susan S. Wigoda, of counsel), guardian *ad litem*.

JUSTICE HOWSE delivered the opinion of the court:

Respondent Charity E. appeals from an order of the circuit court finding her unfit as a parent as defined in sections 1(D)(b), (D)(g) and (D)(m) of the Adoption Act (750 ILCS 50/1(D)(b), (D)(g), (D)(m) (West 2008)), and pursuant to section 2—29 of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2—29 (West 2008)), and terminating her parental rights to her minor children C.E. and R.E. Respondent contends the evidence failed to establish she was unfit

and that section 1(D)(g) is unconstitutional as it violates her right to equal protection. For the reasons set forth below, we affirm.

## BACKGROUND

Respondent is the biological mother of C.E., born on March 20, 2004, and R.E., born on June 28, 2006. Jasper J. is the father of C.E. and Keith B. is the father of R.E.; neither is a party to this appeal.

### Background of the Case for C.E.

On November 18, 2005, then 20-month-old C.E. was taken to Children's Memorial Hospital, where she was diagnosed with fractures of her right femur, left humerus, right radius, right middle finger, right ring finger and left radius. C.E. also had increased liver enzymes and her injuries were in various stages of healing. Medical testimony indicated that C.E.'s injuries were consistent with child abuse.

The trial court granted protective custody of C.E. to the Department of Children and Family Services (DCFS) on November 22, 2005.

On November 23, 2005, the State filed a petition for adjudication of wardship of C.E., alleging she was physically abused, at risk for substantial physical injury and neglected because she was in an injurious environment.

Respondent appeared in court and an assistant public defender was appointed to represent her. Jasper J., the putative father for C.E., was not notified and did not appear in court on that date. On March 9, 2006, the trial court found that Jasper J. was C.E.'s father.

On January 25, 2006, the State amended its petition for adjudication of wardship alleging that C.E. suffered multiple rib fractures, lower vertebrae fractures, and a spinal cord contusion and that respondent failed to seek medical treatment for the injuries.

On June 14, 2006, the State amended the petition alleging torture, based on the number and specificity of C.E.'s injuries, and that she was severely underweight.

On August 28, 2006, the trial court found that C.E. was physically abused, tortured, at substantial risk of physical injury and was in an injurious environment. The trial court also found that a parent inflicted the abuse and that it would be in C.E.'s best interest to be adjudicated a ward of the court.

The trial court conducted permanency planning hearings for C.E. on August 28, 2006; February 9, 2007; August 15, 2007; and May 15, 2008. At each hearing the trial court entered a goal for return home in 12 months and noted that respondent made some progress but there was a need for continued services.

### Background of R.E.

On July 5, 2006, just a few days after her birth, R.E., was taken into temporary protective custody, after the State filed a petition for

adjudication of wardship alleging that R.E. was at substantial risk of physical injury and was in an injurious environment. The public guardian was appointed as attorney and a guardian *ad litem* for R.E.

The trial court conducted an adjudicatory hearing for R.E. on June 1, 2007, and found R.E. was at substantial risk of physical injury because of the prior findings for her sister C.E. and that R.E.'s parents need to complete certain service requirements.

On May 15, 2008, the trial court conducted a dispositional hearing in R.E.'s case and found that based on the evidence presented, it was in her best interest to adjudicate her a ward of the court.

Permanency planning hearings were conducted on May 1, 2007, and on May 15, 2008. The trial court found that respondent was engaged in services and had made some progress.

On December 11, 2008, the trial court consolidated the children's cases for a permanency hearing and entered the goal of substitute care pending a court determination on the issue of termination of parental rights. The trial court found that respondent participated in some of the services but could not parent either child because both children had special needs.

### Termination Hearing

On May 28, 2009, the State filed a termination motion for R.E. On June 23, 2009, the State filed a supplemental petition for appointment of a guardian with the right to consent to adoption for C.E. Each of the documents alleged that respondent failed to maintain a reasonable degree of interest, concern or responsibility for the children's welfare, failed to protect the girls, failed to make reasonable efforts to correct the conditions that were the basis for the children's removal from her care, and failed to make reasonable progress toward the return home of the children.

On February 2, 2010, a hearing on the termination of parental rights was held. The parties stipulated to respondent's July 13, 2006, conviction for endangering C.E.'s life and noted respondent's sentence of 18 months' probation. C.E.'s medical records from St. Bernard Hospital and Children's Memorial Hospital were admitted into evidence over respondent's objection.

State witness Dr. Emalee Flaherty, medical director of the protective service team at Children's Memorial Hospital, was certified as an expert in the fields of pediatrics and child abuse over respondent's objection. Dr. Flaherty testified that C.E. was evaluated by the protective service team in November of 2005. Dr. Flaherty testified that in the course of the evaluation, her team talked to treating physicians, interviewed family members, reviewed laboratory studies and viewed imaging studies and issued a written report.

Dr. Flaherty testified that C.E.'s fractured femur was very unusual and was of the type they typically observe in children with severe bone disease. Dr. Flaherty testified that respondent provided a history that the injury was the result of C.E. falling off an air mattress. Dr. Flaherty testified that respondent also provided in her history that C.E. had fallen off her bicycle three or four days before her visit to the hospital but continued to run and play.

Dr. Flaherty opined that a fall off an air mattress could not generate sufficient force to cause the fracture that C.E. suffered. Dr. Flaherty opined that C.E.'s femur was broken "straight across the bone, and that takes some kind of three-point bending mechanism," which she described as the same as putting a stick across your knee and breaking it. Dr. Flaherty opined that C.E. would feel extreme pain from the injury, particularly when her diaper was changed. She opined that the area would be tender and swollen and C.E. would not have been able to walk or crawl.

Dr. Flaherty testified that imaging testing revealed C.E. had a fractured left humerus, a large bone in the arm next to the shoulder, that was likely an old fracture. C.E. had a fractured right distal radius in the right forearm close to the wrist that was also described as an old fracture. Dr. Flaherty testified that C.E. had suspicious fractures in her middle and ring fingers. Dr. Flaherty opined that these type of fractures "are so unusual, and they're usually caused by child abuse at this age."

Dr. Flaherty testified that C.E. had five fractured ribs that were "old healing fractures" and "have high specificity for child abuse." Dr. Flaherty opined the most common mechanisms for this injury is for a child to be held and squeezed around the chest cage or from a direct blow. Dr. Flaherty testified that an MRI revealed that C.E. had spinal cord injuries as well.

Dr. Flaherty testified C.E. was extremely small for her age and ranked less than the fifth percentile in her weight category. She was actually more like an 11-month-old baby despite the fact she was 20 months old. Dr. Flaherty testified there was a concern C.E. was not being properly fed. C.E. also had a bruise on her left forehead and on her left cheek. C.E. had elevated liver enzymes, which raises suspicions about internal injuries but none were detected.

Dr. Flaherty testified respondent offered an explanation for C.E.'s fractured right radius, stating that her boyfriend was locked in the closet with C.E., who was screaming. When C.E. came out of the closet, she was holding her arm and respondent noticed a knot on the arm and put an Ace bandage on it. Dr. Flaherty testified respondent also stated that C.E. went for a ride in a limousine with her boyfriend one day and returned with swollen hands.

Dr. Flaherty testified that there is a bright area on C.E.'s distal tibia visible in a bone scan that is very suspicious. Dr. Flaherty testified that respondent stated that C.E. came home limping after she had gone out with her boyfriend in the late summer. Dr. Flaherty testified that respondent did not take C.E. to obtain medical attention for any of her injuries and did not have any explanation for C.E.'s rib fractures or spinal cord injury.

Dr. Flaherty opined to a reasonable degree of medical certainty that all of C.E.'s injuries were caused by "child physical abuse." Dr. Flaherty opined that respondent's failure to seek medical care for C.E. was medical neglect.

State witness Jacqueline Moore, the Children's Home and Aid caseworker for C.E. and R.E. since April, 2008, testified that C.E. is now five years old and participates in speech therapy, occupational therapy and social work services.

Moore testified that R.E. participates in speech therapy, physical therapy and social work services at school. R.E. wears braces on her feet every other week and continues to need physical therapy to work on her walking issues.

Moore testified that respondent has never attended any of the girls' medical, dental, vision or hearing appointments. Moore testified that respondent has never gone to any school meetings or appointments for either child. Moore testified that respondent has bus passes that permit her to attend these appointments without charge.

Next, Abbie Kelley, a psychotherapist and parent coach with Mary & Tom Leo and Associates, testified that she helps respondent to learn effective parenting skills to maximize her strengths. Kelley testified that she conducted four sessions with respondent and her daughters beginning in December 2008.

Kelley testified that respondent's ability to connect with her daughters and parent them decreased with time. Kelley testified that respondent was not particularly affectionate with the girls when she praised them. C.E. demanded more of respondent's attention while R.E. was more reserved and did not receive as much attention from respondent.

Kelley testified that at first respondent demonstrated some improvement but her own needs interfered and she could not sustain any gains. Kelley opined that respondent cognitively grasped her suggestions but "there was sometimes a disconnect between the application of the skills."

Kelley opined that respondent's largest inadequacy was the state of her own mental health and her inability to be truly emotionally present with her daughters. Kelley testified that respondent did not

have a lot of energy and, in order to cope, became very focused on a task. Kelley testified that respondent could not simultaneously respond to the girls' emotional needs.

Kelley opined that respondent displayed evidence of underlying depression that interfered with her ability to connect emotionally and interpret her daughters' cues. Kelley opined that respondent needed to focus on her own issues in individual therapy in order to reach the point where she could be sufficiently emotionally available to benefit from parenting coaching.

On cross-examination, Kelley opined that respondent's reactive attachment disorder interfered with her ability to emotionally connect with the girls. Kelley opined that respondent was reacting to her children rather than being proactive with them and had trouble anticipating their needs. Kelley testified that she was concerned that respondent was easily overwhelmed when she had more than one child to parent at a time. Kelley opined that respondent could not successfully multitask by supervising one child and responding to the needs of another child. Kelley opined that respondent's coping and parenting skills did not improve. Kelley testified that her services ended in February 2009 without being completed.

On the second day of the termination hearing, the State's expert witness in clinical psychology, Dr. Neha Patel, associate coordinator of the Cook South Parenting Assessment Team from the Community Mental Health Council, testified that the caseworker referred her to the instant matter for an assessment in 2007. Dr. Patel testified that respondent was diagnosed with reactive attachment disorder, inhibited avoidant type, with depressed features and is generally the result of suffering "gross neglect" as a child. Dr. Patel testified that it is a long-term diagnosis that results in a characterological way of relating to people. Dr. Patel opined that respondent fit into the category of "disengaged type two, based on her descriptions of her children as individuals." Dr. Patel opined that respondent could not discuss her daughters with any sense of their strengths, weaknesses, unique characteristics and her relationship with them.

Dr. Patel testified that her parenting assessment team (PAT) observed some improvement with respondent in 2008 when she perceived more of her daughters' strengths and weaknesses. However, Dr. Patel opined that respondent was still "disengaged" for R.E. while "balanced" for C.E.

Dr. Patel testified that the PAT determined that respondent was at high risk for future child maltreatment or neglect and was concerned that respondent demonstrated impaired or poor judgment based upon clinical interviews as well as from the history of the case. Dr. Patel

testified that the PAT observed in 2007 that respondent could not meet the needs of the children without prompting from other adults. Dr. Patel testified that the PAT determined that respondent had limited insight about C.E.'s injuries and did not recognize the signs that her daughter was hurt.

Dr. Patel testified that the PAT noted that respondent could engage well with one child at a time in a limited situation. However, over time, she could not maintain her energy level or emotionally focus upon more than one child at a time. Dr. Patel testified that when respondent became overwhelmed she simultaneously disengaged from her children.

Dr. Patel testified that the PAT evaluated respondent again in 2008 and diagnosed her with reactive attachment disorder, inhibited avoidant type, with depressed features. She also had a diagnosis of major depression by history and personality disorder. Dr. Patel testified there was a marked difference between the PAT's observations of respondent in the office and in her home. Respondent could manage her children for a specific amount of time with energy and positive involvement during her office visit. However, at home, respondent could not focus on the children and maintain her energy level.

Dr. Patel testified that during the home visit, respondent gave C.E. attention but did not attend to her two younger children, such as checking to see if their diapers needed to be changed or whether they were hungry.

Dr. Patel testified that the PAT determined that respondent was at moderate risk for future maltreatment and neglect even though she made progress and demonstrated increased awareness. There was a concern about her ability to be consistent and maintain the energy level she needed to be attuned to her children and their needs.

The termination hearing continued on February 8, 2010, where testimony began with Ladonna Woods, a child protection investigator with DCFS. Woods testified that she was assigned to investigate C.E.'s case in November 2005 due to allegations of risk of harm and fractured bones.

Woods testified that she asked respondent what happened to her daughter and respondent did not know. Woods testified that respondent blamed her ex-boyfriend Keith B. for C.E.'s injuries and told her that she found him with C.E. several times and "those situations concerned her."

Woods testified that respondent told her that C.E. ran when she heard Keith B's voice. Woods testified that she asked respondent if she thought C.E. was in danger with Keith B. and respondent said no, but in retrospect she thought she was in denial.

The State and the assistant public guardian rested. The respondent's motion for a directed finding was denied.

Jacqueline Moore, who had previously testified for the State, now testified for respondent. Moore testified that respondent worked with a parenting coach from November 2008 through February 2009 and again in November 2009. Moore testified that she rated respondent satisfactory on her most recent client service plan for domestic violence counseling, individual therapy and couples counseling. She also rated respondent satisfactory for her progress in visitation with her daughters.

On cross-examination, Moore testified she supervised some of respondent's visits with her daughters from April 2008 through the end of the year. Moore testified that she did not observe a bond between respondent and R.E. during any of the visits she attended.

On redirect, Moore testified that respondent did not intervene when C.E. took a toy from her sibling. Moore testified that respondent did not demonstrate parenting in her interactions with C.E. Moore testified that C.E. sometimes responded to respondent while at other times she ran around and did not pay any attention to respondent. Moore testified that at times, the environment was chaotic.

The hearing continued on February 23, 2010, where Lynda Barnes, trauma support case manager with Heartland Alliance Human Care Services, testified for respondent. Barnes testified that she was assigned to work with respondent at the end of 2007 and worked with her for two years. Barnes testified that the goals for her work with respondent were to understand domestic violence and what brought her daughters' cases into the child welfare system and to recognize signs so that she would not become involved in another abusive relationship.

Barnes testified that respondent made progress and was able to say that she was a victim of domestic violence. Barnes testified that she worked with respondent to identify red flags for child abuse in an abusive relationship such as when a child cries when she is in the same room as another person or if the child does not want to spend time with a particular person. Barnes testified that respondent met all of her treatment goals.

On cross-examination, Barnes testified that it took respondent approximately six months of counseling to begin to understand how her daughters became involved in the child welfare system. Barnes testified that respondent told her that Keith B. physically abused C.E. and her. Barnes testified that she did not observe interaction between respondent and her daughters.

The hearing continued to February 24, 2010, where Dr. Helen

Evans, a clinical psychologist, testified for respondent. Dr. Evans testified that she specializes in depression, stress and post-traumatic stress disorder. Dr. Evans has been respondent's therapist for a year and a half and meets with her weekly.

Dr. Evans testified that the goals she established for respondent were to fully grasp how the family became involved in the child welfare system, to understand C.E.'s injuries, to learn how to protect her children in the future, to know how her personal history as an abused, abandoned and neglected child impacts her current relationships, to alleviate her depression and to help her become more independent and self-sufficient.

Dr. Evans testified that respondent made progress and opined that she can make better choices regarding the people that she permits to be with her children. Dr. Evans testified that respondent is less depressed and has more of a support system. Dr. Evans opined that respondent has improved her ability to tolerate frustration and manage angry feelings. Dr. Evans testified that respondent is more open and willing to talk about important issues and is still working to become more independent.

After Dr. Evans' testimony, respondent rested. Following closing arguments, the trial court found respondent unfit to parent C.E. by clear and convincing evidence under subsections (b), (g) and (m) of section 1(D) of the Adoption Act (750 ILCS 50/1(D)(b), (D)(g), (D)(m) (West 2008)) from August 2006 until at least May 2, 2009. The trial court found respondent unfit to parent R.E. under subsections (b), (g) and (m) of section 1(D) of the Adoption Act (750 ILCS 50/1(D)(b), (D)(g), (D)(m) (West 2008)) from June 1, 2007, to May 28, 2009.

The trial court based its findings on the fact that respondent was convicted of endangering C.E.'s life by allowing C.E. to be abused and neglected and failing to provide medical treatment for her serious injuries. The trial court noted that the most recent PAT report documented that after nearly five years of services, respondent still cannot attend to her children's emotional needs or comfort them, she cannot offer sufficient attention to two children simultaneously, and she was only able to minimally master interventions that were taught to her. The trial court also noted Kelley's testimony that respondent placed her own emotional needs ahead of those of her children and continues to need individual therapy and parenting coaching. The trial court found that the case has been in the system for four years and respondent still cannot protect her children from abuse or neglect.

## Best Interest Hearing

State witness Rochelle F., C.E.'s and R.E.'s foster parent, testified that C.E. has been in her home since she came into DCFS custody.

Rochelle F. testified that C.E. has been participating in speech and occupational therapy at school since age three and that she has improved by 40%.

Rochelle F. testified that initially C.E. did not talk but is now toilet trained, can write her name, is more social and affectionate and plays a little more with the other children at the home. Rochelle F. testified that she can meet all of C.E.'s special needs and feels she has a bond with her.

Rochelle F. testified that R.E., who came to her home when she was seven days old, participates in occupational therapy because she has bilateral braces on her feet and is also engaged in speech therapy.

Rochelle F. testified that the girls get along with the other children in her home, including a 15-year-old adopted son, two male cousins, and a 6-year-old girl. Rochelle F. testified that the girls want the older boys to help them with their school work and that R.E. and the six-year-old are very close. R.E. is more connected to the six-year-old than she is to C.E.

Rochelle F. testified that she is well equipped to advocate for C.E.'s and R.E.'s educational needs, she has the girls going to church weekly, and she plans to enroll them in ballet classes. Rochelle F. testified that she has a large extended family and they come together regularly to celebrate birthdays and holidays. Rochelle F. testified that she has three different backup plans for the girls in case something happens to her.

Rochelle F. testified that she wants to adopt C.E. and R.E. if parental rights are terminated and she considers them her own children and provides a safe, nurturing and positive environment. Rochelle F. testified that she would continue to facilitate visits for C.E. and R.E. with their biological brother if she adopts them.

Next, State witness Moore testified that she recently visited Rochelle F.'s home and found it safe and appropriate for the girls. Moore testified that Rochelle F. visits the girls' school frequently, advocates for services for them and regularly takes advantage of DCFS training programs.

Moore opined that it is in the children's best interest to terminate parental rights because "there will always be neglect" with respondent and the girls have bonded with Rochelle F. Moore testified that R.E. identifies Rochelle F. as her mother and would be devastated if removed from her home.

Respondent testified that she has a very strong relationship with C.E. but her relationship with R.E. is not as strong. Respondent testified that she does not believe her daughters' best interests will be served through adoption. Respondent testified that she is concerned

that she will never see them again and that she has worked hard to see them. Respondent testified that the girls' best interest is to be in her home because "we love them."

Respondent testified that she is aware R.E. may suffer emotional trauma if she is removed from the foster home and she would not cut the children off from Rochelle F.

Following arguments from both parties, the trial court found that it was in the best interest of C.E. and R.E. to terminate their mother's parental rights and appoint a guardian with the right to consent to their adoption.

Respondent was then advised by the trial court of her rights to appeal and now brings this appeal.

## ANALYSIS

In this appeal, respondent argues: (1) the trial court erred in finding that she failed to maintain a reasonable degree of interest, concern or responsibility for C.E.'s and R.E.'s welfare pursuant to section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2008)); (2) the trial court erred in finding that she failed to make reasonable progress toward the return of her children within nine months (or any nine-month period) after an adjudication of neglect and abuse, pursuant to sections 1(D)(m)(ii) and (iii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii), (D)(m)(iii) (West 2008)); and (3) section 1(D)(g) is unconstitutional as a violation of respondent's right to equal protection.

### Termination of Parental Rights

The Juvenile Court Act of 1987 provides a bifurcated mechanism whereby parental rights may be terminated. *In re Konstantinos H.*, 387 Ill. App. 3d 192, 203, 899 N.E.2d 549, 558 (2008); 705 ILCS 405/2—29(2) (West 2008). First, there must be a showing, based on clear and convincing evidence, that the parent is "unfit," as that term is defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2008)). *In re C.W.*, 199 Ill. 2d 198, 210, 766 N.E.2d 1105, 1112-13 (2002). Upon a finding of unfitness, the trial court must then determine whether the termination of a parent's right is in the best interest of the minor. *In re R.L.*, 352 Ill. App. 3d 985, 998, 817 N.E.2d 954, 965 (2004).

Although section 1(D) of the Adoption Act sets forth numerous grounds under which a parent may be deemed "unfit," any one ground, properly proven, is sufficient to enter a finding of unfitness. *In re C.W.*, 199 Ill. 2d at 210, 766 N.E.2d at 1113. Because the trial court is in the best position to assess the credibility of witnesses, a reviewing court may reverse a trial court's finding of unfitness only

where it is against the manifest weight of the evidence. *In re Reiny S.*, 374 Ill. App. 3d 1036, 1045, 871 N.E.2d 835, 843 (2007). A decision regarding parental fitness is against the manifest weight of the evidence where the opposite conclusion is clearly the proper result. *In re D.D.*, 196 Ill. 2d 405, 417, 752 N.E.2d 1112, 1119 (2001). Each case concerning parental unfitness is *sui generis*, requiring close analysis of its individual facts. *In re T.D.*, 268 Ill. App. 3d 239, 245, 643 N.E.2d 1315, 1320 (1994). Consequently, factual comparisons to other cases by reviewing courts are of little value. *In re T.D.*, 268 Ill. App. 3d at 245, 643 N.E.2d at 1320.

### Section 1(D)(b) of the Adoption Act

The trial court found respondent unfit under section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2008)) because:

> "She's unable to remain attune[d] to her children's needs and attend to them in a safe and effective manner over time.
>
> The conclusion of the reports and testimony is that after four years of this case being in our system, she has not reached the point where she can effectively parent these children and protect them from abuse and neglect."

Respondent claims there is not clear and convincing evidence to support the trial court finding that she is unfit under section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2008)).

Under section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2008)):

> " 'Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption. The grounds of unfitness are any one or more of the following \*\*\*:
>
> \* \* \*
>
> (b) Failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare."

Because the language of section 1(D)(b) of the Adoption Act is in the disjunctive, any of the three elements may be considered on its own as a basis for unfitness: the failure to maintain a reasonable degree of interest or concern or responsibility as to the child's welfare. *In re Konstantinos H.*, 387 Ill. App. 3d at 204, 899 N.E.2d at 558-59. Factors to be applied toward an analysis of these elements include consideration of a parent's efforts to visit and maintain contact with the child, as well as other indicia of interest, such as inquiries into the child's welfare. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064, 859 N.E.2d 123, 135 (2006). Further, a court must examine the parent's conduct in the context of the parent's circumstances. *In re T.D.*, 268

Ill. App. 3d at 246, 643 N.E.2d at 1320. Relevant circumstances include, for example, difficulty in obtaining transportation, the parent's poverty, statements made by others to discourage visitation, and whether the parent's lack of contact with the children can be attributed to a need to cope with personal problems rather than indifference toward them. *In re T.D.*, 268 Ill. App. 3d at 246, 643 N.E.2d at 1320.

Respondent claims she has maintained a reasonable degree of interest in her children by attending all her visits, attending all service appointments, engaging in the clinical process and attempting to change her life.

However, the evidence shows respondent has not attended any of the girls' medical, dental, vision or hearing appointments even though bus fare has been provided for her. Caseworker Moore testified that respondent has not attended any school meetings or appointments for either child.

Furthermore, we cannot say the evidence shows that respondent displays a reasonable concern or interest when visiting with the children.

For example, parent coach Kelley testified that respondent was not particularly affectionate with the girls when she praised them and that respondent showed interest in C.E. but not R.E. Kelley also testified that respondent became less enthusiastic as the coaching sessions went on and that "it became clear that respondent mother was only minimally practicing the techniques outside of [the] sessions."

Moreover, Dr. Patel opined that respondent could not discuss her daughters with any sense of their strengths, weaknesses, and unique characteristics and nor could she discuss her relationship with them. Dr Patel further opined that respondent is "disengaged" from R.E. Dr. Patel testified that the PAT initially found respondent at a high risk for future child maltreatment or neglect and she later improved to moderate risk for future maltreatment and neglect. Dr. Patel testified that the PAT observed in 2007 that respondent could not meet the needs of the children without prompting from other adults and had limited insight about C.E.'s injuries and did not recognize the signs that her daughter was hurt.

Dr. Patel further testified that during home visits respondent gave C.E. attention but did not attend to her two younger children. Dr. Patel testified that respondent did not check to see if their diapers needed to be changed or whether they were hungry.

The record shows that the trial court considered all the evidence in making its determination. While we acknowledge respondent's attendance for service and visitation appointments, we cannot say the

trial court's decision, that respondent failed to maintain a reasonable degree of interest or concern or responsibility as to her children's welfare, was against the manifest weight of the evidence. Therefore, the trial court decision should not be disturbed.

### Sections 1(D)(m)(ii) and (iii) of the Adoption Act

Respondent claims the trial court erred in finding she failed to make reasonable progress toward the return of her children within any nine-month period after an adjudication of neglect and abuse, pursuant to sections 1(D)(m)(ii) and (iii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii), (D)(m)(iii) (West 2008)).

Under section 1(D)(m)(ii) of the Adoption Act, a parent may be declared unfit when:

> "Failure by a parent *** to make reasonable progress toward the return of the child to the parent within 9 months after an adjudication of neglected or abused minor under Section 2—3 of the Juvenile Court Act of 1987 ***." 750 ILCS 50/1(D)(m)(ii) (West 2008).

Under section 1(D)(m)(iii) of the Adoption Act, a parent may be declared unfit when:

> "Failure by a parent *** to make reasonable progress toward the return of the child to the parent during any 9-month period after the end of the initial 9-month period following the adjudication of neglected or abused minor under Section 2—3 of the Juvenile Court Act of 1987 ***." 750 ILCS 50/1(D)(m)(iii) (West 2008).

Further, factors to be considered for a determination of reasonable progress include:

> "(I) the parent's failure to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care within 9 months after the adjudication under Section 2—3 or 2—4 of the Juvenile Court Act of 1987 and (II) the parent's failure to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care during any 9-month period after the end of the initial 9-month period ***." 750 ILCS 50/1(D)(m)(iii) (West 2008).

Moreover, our supreme court instructs:

> "[I]n light of the 'deep human importance' of parental rights and responsibilities [citation], and the fundamental liberty interest at stake [citation], courts must take care to ensure that the statutory requirements for service plans are met in every case, and that overall focus in evaluating a parent's progress toward the return of the child remains, at all times, on the fitness of the parent in relation to the needs of the child.

\*\*\* [T]he benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d 181, 216-17, 752 N.E.2d 1030, 1050 (2001).

Respondent contends the trial court's finding that respondent is unfit is against the manifest weight of the evidence because respondent's progress could not be sufficiently measured since a parenting coach was not provided until after the trial court entered a goal to terminate respondent's parental rights at the December 11, 2008, permanency hearing.

Respondent's claim is unpersuasive because the record shows the trial court, in finding that respondent did not make sufficient progress in service, considered the evidence provided by all the service personnel involved in the case at bar including parent coach Kelley.

Respondent next contends that her inability to bond with R.E. is a reflection of the caseworkers rather than of herself.

Respondent does not offer an explanation as to how the caseworkers inhibited her ability to bond with R.E., and we fail to see how the caseworkers inhibited her ability to bond with R.E. Respondent suggests that she could have bonded with R.E. if she was able to do so separated from C.E. However, if respondent had obtained her goal—reunification of both girls—she would have to attend to both girls together in her home. The record supports the inference that respondent is unable to parent both children together.

Dr. Patel opined respondent was a moderate risk for future maltreatment and neglect and expressed significant concerns about respondent's ability to maintain energy, respond to her children's needs without prompting from other adults, and to be emotionally attuned to the children.

Parent coach Kelley opined that respondent demonstrated minimal capacity to internalize the parenting instruction she received. Kelley testified that respondent began her parenting coaching sessions motivated but with time became "less enthusiastic about the sessions and it became clear that she was only minimally practicing the techniques outside of our sessions." Furthermore, Kelley terminated her effort because respondent needed to make more progress addressing her own complex mental health needs. The trial court noted that respondent could not acknowledge why her daughters were in the system until "sometime in 2009."

The evidence shows that despite several years of therapy, assistance and coaching, respondent is incapable of safely and effectively parenting C.E. and R.E. As a result, we cannot say the trial court's decision was against the manifest weight of the evidence. Therefore, the trial court decision should not be disturbed.

## Equal Protection

Respondent claims section 1(D)(g) of the Adoption Act is unconstitutional as a violation of her right to equal protection.

Under section 1(D)(g) of the Adoption Act, a parent is unfit when there is a "[f]ailure to protect the child from conditions within his environment injurious to the child's welfare." 750 ILCS 50/1(D)(g) (West 2008).

An equal protection claim requires a threshold allegation that the plaintiff was treated differently from similarly situated individuals. *Plyler v. Doe*, 457 U.S. 202, 216, 72 L. Ed. 2d 786, 798, 102 S. Ct. 2382, 2394 (1982); *People v. Whitfield*, 228 Ill. 2d 502, 512, 888 N.E.2d 1166, 1172 (2007).

In support of her claim, the respondent relies on *In re D.W.*, 214 Ill. 2d 289, 827 N.E.2d 466 (2005). In *In re D.W.*, a consolidated appeal, respondents claimed section 1(D)(q) of the Adoption Act was unconstitutional because under that section a parent was presumed unfit if the parent had been criminally convicted of aggravated battery, heinous battery, or attempted murder of any child (750 ILCS 50/1(D)(q) (West 2002)). *In re D.W.*, 214 Ill. 2d at 291, 827 N.E.2d at 470. Respondent argued that the more serious offenses of section 1(D)(i) of the Adoption Act (750 ILCS 50/1(D)(i) (West 2002)), allowed for a rebuttable presumption of unfitness when a parent was convicted of murder, solicitation to commit murder of any child and aggravated criminal sexual assault. *In re D.W.*, 214 Ill. 2d at 292-93, 827 N.E.2d at 470. Our supreme court found section 1(D)(q) unconstitutional because it failed to allow "meaningful rebuttal." *In re D.W.*, 214 Ill. 2d at 317, 827 N.E.2d at 485.

The case at bar is distinguishable because section 1(D)(g) does not concern nor require a criminal conviction and does not contain a presumption of unfitness. Under section 1(D)(g), unlike the former section 1(D)(q) where the parent was presumed unfit by virtue of their criminal conviction, the trial court's finding is based on clear and convincing evidence.

In the case at bar, respondent had the opportunity to present her own witnesses. The trial court heard evidence to support a finding that respondent failed to protect her children. For example, Dr. Flaherty opined that C.E.'s injuries were numerous and "unusual" and

were caused by child abuse. Also, the record shows that respondent told an investigator that Keith B. abused C.E. and the evidence shows respondent failed to protect C.E. from Keith B.

However, respondent maintains that section 1(D)(g) of the Adoption Act does not provide for any opportunity to rebut the finding that the parent failed "to protect the child from conditions within his environment injurious to the child's welfare" or to present evidence of attempts to correct the conditions that brought the case to court.

Our supreme court in *In re C.W.* thoroughly explored section 1(D)(g) and found:

> "Although the provision of services to parents is an integral part of the statutory scheme [citation], there is no requirement under section 1(D)(g) that a parent be permitted a period of time to correct or improve an injurious environment before he or she may be found unfit on this ground. ***
>
> Additionally, evidence that a parent substantially completed offered services, or otherwise refrained from prior objectionable conduct following removal of the child, does not somehow absolve or erase the parent's initial failing that triggered State intervention and removal of the child. Rather, such evidence is appropriately considered at the second stage of the termination hearing, at which [time] the court considers whether it is in the best interest of the minor that parental rights be terminated. At that time, the full range of the parent's conduct can be considered." *In re C.W.*, 199 Ill. 2d at 216-17, 766 N.E.2d at 1116.

In sum, respondent has not shown she was treated differently from a similarly situated individual, or that section 1(D)(g) contains a presumption of unfitness or that she was unable to rebut or present evidence.

As a result, we cannot say the trial court's finding of respondent unfit under section 1(D)(g) of the Adoption Act violated her right to equal protection.

## CONCLUSION

Based on the foregoing, the judgment of the trial court is affirmed.

Affirmed.

TOOMIN, P.J., and LAVIN, J., concur.