2019 IL App (2d) 190685-U
No. 2-19-0685
Order filed December 13, 2019

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* C.P., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| | ) | |
| | ) | Nos. 16-JA-114 |
| | ) | 18-JA-121 |
| | ) | |
| | ) | Honorable |
| (The People of the State of Illinois, Petitioner- | ) | Christopher Morozin, |
| Appellee, v. Carnise P., Respondent-Appellant.)) | | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Presiding Justice Birkett and Justice Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Trial court's finding that mother was unfit was not against the manifest weight of the evidence.

¶ 2    On May 2, 2019, the trial court found the appellant, Carnise P., unfit pursuant to section 1(D)(m) of the Adoption Act (750 ILCS 50/1(D)(m) (West 2016)) on the basis that she had failed to make (a) reasonable efforts to remedy the conditions that led to the removal of her son C.P. from her care or (b) reasonable progress toward C.P.'s return home.  The trial court later found that it was in the best interests of C.P. that Carnise's parental rights be terminated and that C.P. be made available for adoption.  Carnise appeals, and we affirm.

¶ 3                                  I. BACKGROUND

¶ 4      C.P. was born on September 3, 2016.  Carnise is his mother, and she identified his father as Lloyd Brady.  The parental rights of Brady and any other putative father are not at issue in this appeal.

¶ 5      The following facts are drawn from the exhibits and from the testimony of Erin Berry, the caseworker for C.P. at all relevant times.  When C.P. was less than one month old, Carnise was arrested after she got into a fight with her roommates during which she had a knife.  There was an unconfirmed report that one of the roommates had pointed a gun at Carnise.  C.P. was left in a taxicab nearby during the fight.  On October 4, 2016, the trial court granted temporary custody of C.P. to the Department of Child and Family Services (Department),[1] and he was placed in a traditional foster home.

¶ 6      Berry met with Carnise in November 2016 to go over the services Carnise would need to complete in order to regain custody of C.P.  The services included an integrated assessment, a mental health assessment, and parenting classes.  In addition, Carnise would need stable housing and income.

---

[1] This order was entered in case no. 16-JA-114 (Lake County circuit court).  For unknown reasons, the petition for termination of parental rights was filed under case no. 18-JA-121.  Although the two cases were never consolidated, the order terminating Carnise's parental rights (from which she appeals) listed both case numbers.  Further, the agency reports to the court and the orders entered in 16-JA-114 were made exhibits at the trial of the petition filed in 18-JA-121; thus, they are part of the record before us.

¶ 7    In January and February 2017, Carnise attended three or four parenting classes.  She also did an intake assessment with NICASA.  That assessment resulted in several recommendations for further services, including a psychiatric evaluation and individual counseling.  No substance abuse issues were noted.

¶ 8    Carnise's interactions with Berry and other agency staff during this time were sometimes problematic.  Berry testified that there were times that she and Carnise could have a good conversation, but at other times "things very quickly got aggressive."  For instance, in January 2017, Berry and Carnise planned to meet at Berry's office, after which Berry was to drive her to court for a scheduled status hearing.  After Carnise did not appear at the office, Berry called her. Carnise reported that she was at a particular Walgreens drug store.  Berry (with an intern) drove to the Walgreens but Carnise was not there.  Carnise then told Berry that she was at a different Walgreens.  Berry drove to that second Walgreens but again Carnise was not there.  Berry called Carnise again, advising that she and the intern needed to leave for court and could not wait any longer.  Carnise became angry and told Berry that the next time she saw Berry she would punch Berry in her "f***ing face."  After that, Berry refused to meet one-on-one with Carnise.

¶ 9    In March 2017, Carnise was arrested.  She was released in April 2017.  However, in May 2017 she was again arrested and was charged with aggravated battery of a police officer.  She remained in jail until December 2017 on these charges.  In the criminal proceedings based on these charges, questions were raised as to Carnise's mental health and her fitness to stand trial.  As a result, she spent time in the Elgin Mental Health Center; the exact length of time is unknown.

¶ 10    On March 23, 2017, the trial court adjudicated C.P. a neglected minor on the basis of the October 2016 fight.  On April 20, 2017, the trial court granted guardianship of C.P. to the Department.

¶ 11    The first six-month service plan, which covered the period from March through September 2017, rated Carnise's participation in all of her recommended services as unsatisfactory (except for substance abuse services, as she had completed an assessment showing no services needed for that). Carnise did not have stable housing suitable for a child (being incarcerated for most of this period) and had refused to sign releases for information documenting whether she received SSA benefits, so her income was unknown. She had attended only a few parenting classes before she was arrested. She had met only once with Berry (while she was out of jail in April 2017) and had not maintained contact with the agency otherwise. She had had only two visits with C.P., both of which occurred in the brief period between her stints in jail; no visits had taken place at the jail. Berry knew that Carnise had unspecified mental health issues but Carnise did not want to give any details about that. It was possible that Carnise had received a psychiatric evaluation and other mental health services or medications while she was in the Elgin Mental Health Center, but Berry was unable to learn this because Carnise refused to sign a release for her mental health records.

¶ 12    The next six-month service plan, covering September 2017 to March 2018, included the same services. She was rated unsatisfactory on all of her services. Carnise was in jail for the first half of this period, through December 2017. Upon her release, Berry and Carnise's probation officer met with her and she signed a release so that Berry could exchange information with the probation officer. Thus, although Carnise would not tell Berry where she was living following her release, Berry was able to learn that information from the probation officer. Berry did not visit the home, as Carnise was only permitted to have supervised visits with C.P. and no home visits were anticipated. Carnise met with Berry at the office "a couple of times" between January and March 2018, and Berry spoke with her about the services she needed to complete and where to access them. Berry did not give Carnise a referral form for the Lake County Health Department (where

Carnise could obtain a psychiatric evaluation) because there were no such forms; however, she did provide Carnise with the contact information. Carnise did not follow up to schedule any evaluation or other mental health services. Berry also spoke with the probation officer about services for Carnise, though she did not try to learn what services were ordered for Carnise as part of probation. Carnise did have four or five visits with C.P. during this period. However, she demonstrated a poor understanding of C.P.'s needs and would not accept suggestions or corrections by the agency staff, becoming aggressive and verbally abusive if any were offered. She brought clothes for C.P. during the visits but did not provide any other financial support for C.P.

¶ 13    At the close of the March 20, 2018, permanency hearing, the trial court changed the goal from return home to substitute care pending adoption. In April 2018, Carnise's visits with C.P. were suspended after an incident that occurred at the end of one visit. As the visitation supervisor was attempting to leave with C.P., Carnise's mother blocked the exit with her car (in which Carnise was a passenger). A few months later Carnise was again arrested, and she was still in jail in September 2018.

¶ 14    In July 2018, the State filed a petition to terminate Carnise's parental rights. The State alleged two grounds: failure to make reasonable efforts to correct the conditions that were the basis for C.P. being removed from her care (*id*. § 1(D)(m)(i)) and failure to make reasonable progress toward C.P.'s return home within nine months of the adjudication of neglect (*id*. § 1(D)(m)(ii)).

¶ 15    The hearing on the petition began on April 2, 2019. Berry was the sole witness and testified to the facts related above. On cross-examination, Berry acknowledged that, although she mailed Carnise a copy of the service plan and her contact information while Carnise was in the Lake County jail, she did not know if Carnise received it; she did not know whether Carnise had access

to a telephone to be able to call her; and she never visited Carnise in jail. Berry believed that no services were offered at the Lake County jail except perhaps parenting classes, and she did not contact the jail to find out what services were offered. During closing arguments, Carnise's attorney argued that she had never really had a chance because she had received so little assistance from the agency in accessing services. The trial court took the matter under advisement.

¶ 16    On May 2, 2019, the trial court issued its ruling on fitness. At the outset, the trial court noted that it was concerned about Berry's failure to visit or reach out to Carnise when she was in jail, to identify possible services that might have been available to Carnise in jail, or "to really follow-up effectively with the probation officer" about services for Carnise after she was released. (The trial court also criticized the State for failing to introduce records regarding Carnise's criminal history, noting that it did not know why Carnise was in jail on various occasions.) Nevertheless, the trial court found Berry truthful and credible, and Carnise had been reminded often about the services she needed to complete but had failed to follow up even when she was not in jail and had missed multiple court dates as well.

¶ 17    The trial court found the State had proved both grounds of unfitness by clear and convincing evidence. The first ground was failure to make reasonable efforts to remedy the conditions that led to C.P.'s removal. *Id*. § 1(D)(m)(i). The trial court found that those conditions arose from Carnise's mental health issues and aggressiveness. Carnise had failed to address the mental health concerns or complete individual therapy, and she was both verbally and physically aggressive toward agency staff as well as others. The trial court continued:

"And I have considered *** some of the lack of attentiveness *** of the caseworker Ms. Berry that has been established, I have taken that into consideration, but clearly [Carnise] was before this Court. She was admonished as to what she needed to do. She was mailed the

service plans. It was not a mystery to her as to what she needed to do, and for some reasons unknown to the Court exactly what those were she ended up being incarcerated in jail for several months throughout the case and *** prior to filing of the petition for termination of parental rights.

The Court has considered the concerns that were raised by [Carnise's attorney] in argument and through the testimony of Ms. Berry. I have considered all of that.

And I do find *** the State has met its burden of proof by proving the allegation of unfitness, for failure to make reasonable efforts to correct the condition[s] which were the basis of the removal. It is clear that [Carnise] has not corrected those conditions."

As for the second ground, failure to make reasonable progress toward the child's return home during a nine-month period following adjudication (*id*. § 1(D)(m)), the trial court noted that it was considering the period from March through December 2017. Of those nine months, Carnise was incarcerated for all but one of them. She had only a few visits with C.P., all of which were supervised, and failed to complete any services. Thus, she had not made any progress toward C.P.'s return home.

¶ 18    On July 16, 2019, a best interests hearing was held. Berry testified that C.P.'s foster home, in which he had been living since he was one month old, was stable and loving. He was bonded to his foster parents, whom he referred to as mom and dad. He had three foster siblings there, two who were the birth children of his foster parents and another foster child near his own age. He was healthy and happy. His foster parents wanted to adopt him. At the close of the hearing, the trial court found that it was in C.P.'s best interest that Carnise's parental rights be terminated. This appeal followed.

¶ 19                                II. ANALYSIS

¶ 20    In this appeal, Carnise challenges the trial court's finding that she was unfit, arguing that she was not given an adequate opportunity to participate in services because of her repeated incarcerations and Berry's failure to follow up with her during those incarcerations.

¶ 21    Because the termination of parental rights constitutes a complete severance of the legal relationship between the parent and child, proof of parental unfitness must be clear and convincing. *In re Shauntae P.*, 2012 IL App (1st) 112280, ¶ 88.  The trial court is in the best position to assess the credibility of witnesses, and a reviewing court may reverse a trial court's finding of unfitness only where it is against the manifest weight of the evidence. *Id.* ¶ 89.  A decision regarding parental unfitness is against the manifest weight of the evidence where the opposite conclusion is clearly the proper result.  *In re C.E.*, 406 Ill. App. 3d 97, 108 (2010).  Each case concerning parental unfitness is *sui generis*, meaning that factual comparisons to other cases by reviewing courts are of little value.  *Id.*

¶ 22    In this case, the trial court found Carnise unfit on two grounds.  Although section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2016)) sets forth several grounds under which a parent may be deemed unfit, any one ground, properly proven, is sufficient to sustain a finding of unfitness.  *In re Shauntae P.*, 2012 IL App (1st) 112280, ¶ 89.  Thus, if either ground of fitness is supported by the record, we need not consider the other.

¶ 23    We begin by considering the trial court's finding that Carnise did not make reasonable progress toward C.P.'s return home during the nine-month period at issue.  Reasonable progress is "an objective judgment based upon progress measured from the conditions existing when the parent was deprived of custody" (*In re S.J.*, 233 Ill. App. 3d 88, 117 (1992)) or progress toward correcting "a parental shortcoming that would inhibit the return of the child to the parent" (*In re A.J.*, 296 Ill. App. 3d 903, 914 (1998)).  Here, there is ample support in the record for the trial

court's finding of no reasonable progress. During the nine months after C.P. was adjudicated neglected, Carnise was released from jail but within about three weeks she was re-arrested on charges of aggravated battery against a police officer. She remained in the Lake County jail for the remainder of the period. She had only two visits with C.P. before she was rearrested, and there is no indication that Carnise made any attempts to participate in any services during this period. In fact, Carnise would not even sign releases that might have shown whether she received a psychiatric evaluation or other mental health services while she was in the Elgin Mental Health Center. And her lack of progress is demonstrated by the fact that her re-incarceration was caused by the very aggressiveness and violence that her service plan sought to address.

¶ 24 We note that, although the availability of services while she was in jail was not within her control, the events that led to her re-arrest and her refusal to sign releases that could have helped to document any services that she did participate in were within her control. Further, the trial court correctly noted that Carnise was aware of the services that she needed to complete toward C.P.'s return to her care, but the record does not indicate that she pursued any of those services during the time in question—for instance, if Carnise had sought services while in jail she could have testified to that fact, but she did not. The trial court's finding of no reasonable progress was not against the manifest weight of the evidence. *C.E.*, 406 Ill. App. 3d at 108.

¶ 25                                   III. CONCLUSION

¶ 26 For the reasons stated, the judgment of the circuit court of Lake County is affirmed.

¶ 27 Affirmed.