NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 190835-U

NO. 4-19-0835

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 1, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* I.B., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Plaintiff-Appellee, | ) | No. 15JA185 |
| v. | ) | |
| Reggie B., | ) | Honorable |
| Respondent-Appellant). | ) | Karen S. Tharp, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Knecht and DeArmond concurred in the judgment.

**ORDER**

¶ 1   *Held*:  The trial court's finding that respondent was unfit to parent his minor child was not
against the manifest weight of the evidence.

¶ 2   On November 21, 2019, the trial court terminated the parental rights of respondent,

Reggie B., to his child, I.B. (born April 25, 2009). Respondent appeals, arguing the court's finding

that respondent was unfit was against the manifest weight of the evidence. We affirm.

¶ 3                          I. BACKGROUND

¶ 4   In October 2015, the State filed a petition alleging I.B. was a neglected minor. In

May 2016, the trial court entered an adjudicatory order finding I.B. to be neglected. A month later,

the court entered a dispositional order making I.B. a ward of the court and granting custody and

guardianship of I.B. to the Illinois Department of Children and Family Services (DCFS).

¶ 5        On August 15, 2018, the State filed a motion for termination of parental rights. In its motion, the State alleged respondent was unfit to parent I.B. on the following grounds: (1) failure to maintain a reasonable degree of interest, concern, or responsibility as to I.B.'s welfare (750 ILCS 50/1(D)(b) (West 2016)), (2) between May 12, 2016, and February 12, 2017, failing to make reasonable efforts to correct the conditions which were the basis for the removal of I.B. (750 ILCS 50/1(D)(m)(i) (West 2016)), (3) between February 12, 2017, and November 12, 2017, failing to make reasonable efforts to correct the conditions which were the basis for the removal of I.B. (*id.*), (4) between May 12, 2016, and February 12, 2017, failing to make reasonable progress toward the return of I.B. (750 ILCS 50/1(D)(m)(ii) (West 2016)), (5) between February 12, 2017, and November 12, 2017, failing to make reasonable progress toward the return of I.B. (*id.*), and (6) depravity in that respondent had been convicted of five felonies, one of which occurred less than five years prior to the filing of the State's motion (750 ILCS 50/1(D)(i) (West 2016)). (We note the State also sought to terminate the parental rights of I.B.'s mother and that, ultimately, her parental rights were terminated; however, she is not a party to this appeal, and we discuss the facts only as they relate to respondent.)

¶ 6        On November 29, 2018, the trial court conducted the first of multiple fitness hearings. At the State's request, and without objection from respondent, the court took judicial notice of certified copies of respondent's prior felony convictions, which included: (1) a 2016 conviction for being an armed habitual criminal (Peoria County case No. 15-CF-778) for which respondent was still incarcerated, (2) a 2011 conviction for aggravated battery (Sangamon County case No. 10-CF-939), (3) a 2009 conviction for unlawful possession of a weapon by a felon (Sangamon County case No. 08-CF-1164), (4) a 2007 conviction for criminal trespass to a

residence (McLean County case No. 07-CF-448), and (5) a 2004 conviction for unlawful delivery of a controlled substance within 1000 feet of a church (Sangamon County case No. 04-CF-418).

¶ 7        The State first called Emily Roberts, I.B.'s caseworker from January 2016 until July 2017. Roberts testified that in 2016 she learned respondent was incarcerated and sent him a letter and a copy of the DCFS service plan. This was the only contact Roberts had with respondent. According to Roberts, the service plan she mailed respondent did not state that he was required to complete any tasks or services and Roberts did not add any services to the plan for respondent to complete because "he was incarcerated the whole time [she] had the case." Roberts further testified that no visits with I.B. had been offered to respondent because of his incarceration and respondent had not sent any gifts, cards, or letters to I.B.

¶ 8        The State next called Rebekah Johnson, I.B.'s caseworker from July 2017 until August 2018. Johnson testified that in October 2017, I.B.'s service plan was amended to require respondent to cooperate with an integrated assessment. According to Johnson, an integrated assessment was never scheduled with respondent due to "the demands of casework" and "not because [respondent] was refusing the integrated assessment." Johnson further testified DCFS "made no effort to complete the integrated assessment of [respondent]."

¶ 9        Johnson testified that in August 2017, respondent requested visits with I.B. There had been five supervised visits between December 2017 and July 2018, all of which were conducted at the correctional facility where respondent was being held. According to Johnson, the visits she supervised went well and I.B. seemed to enjoy the time with respondent. Johnson testified I.B. "looked forward to the visits" and "greeted [respondent] enthusiastically." She also testified that respondent "[w]as *** able to *** redirect [I.B.'s] attention or discipline [I.B.] in an

appropriate, age-appropriate manner." Overall, I.B. and respondent "both did well in the visits." Johnson further testified respondent had communicated with her multiple times regarding concerns he had about the foster home in which I.B. had been placed and had sent I.B. gifts, cards, and letters.

¶ 10      The State next presented testimony from Cybil Hoffman, I.B.'s case aide from November 2015 until May 2018. Hoffman testified she had supervised four visits between respondent and I.B., each of which lasted approximately two hours and was conducted at the facility in which respondent was incarcerated. Hoffman testified I.B. was excited to see respondent during these visits, the two interacted well together, and they seemed to enjoy each other's company. Respondent and I.B. "talk[ed] about things like school and any sort of issues that may have been going on with [I.B.]." Between visits, Hoffman received three letters from respondent to give to I.B. According to Hoffman, respondent expressed his concerns about I.B. to her, including his concerns about a black eye I.B. had during a visit.

¶ 11      Next, the State called Jacqueline Dean, I.B.'s caseworker from August 2018 until the date of the hearing. Dean testified she had supervised three visits between I.B. and respondent since she became I.B.'s caseworker, all of which she characterized as "appropriate." According to Dean, respondent had expressed concern about the foster home in which I.B. was placed. Dean testified respondent had not sent any gifts, cards, or letters to I.B. Dean further testified the only task respondent was required to perform under the service plan was to complete an integrated assessment. However, Dean had not attempted to perform an assessment and she "d[id] not have a valid reason" for that omission. Dean testified that at no point had she been close to returning I.B. to respondent's care because he was incarcerated.

¶ 12        On March 28, 2019, respondent testified. According to respondent, he had been incarcerated for approximately four out of the nine years of I.B.'s life. Respondent had been incarcerated when I.B. was born and was not released until I.B. was nine months old at which point he moved in with I.B. and I.B.'s mother and lived with them until he was again incarcerated. Respondent did not live with I.B. between his release from incarceration for the 2011 conviction and his subsequent incarceration in 2015. Rather, at times respondent lived in a different city from I.B. and even in a different state. During this time period, respondent would visit with I.B. "once in a while." According to respondent, he only saw I.B. twice during 2015 and not at all in 2016. Respondent testified he spoke with I.B. a few times by telephone in 2016 when respondent's mother or sister was babysitting I.B. Respondent acknowledged he had never had custody or guardianship of I.B.

¶ 13        According to respondent, he first found out I.B. was in the custody of DCFS in 2017. Respondent testified he had no contact with DCFS until mid-2017 when he received a letter from Johnson. According to respondent, DCFS never informed him he was required to participate in any services or complete any tasks, nor was respondent ever provided a service plan. Respondent further testified he was finally asked to participate in an integrated assessment in mid-March 2019. Respondent also testified he had attempted to discuss his case with DCFS by telephone and by mail but had not received a reply to his calls or letters.

¶ 14        Respondent testified he requested visits with I.B. in mid-2017 but no visit was provided until December of that year. During respondent's visits with I.B., the two would play cards, draw, and talk about school, sports, and I.B.'s emotions and future aspirations. Respondent also testified that he had sent letters and pictures to I.B. but had stopped because he had been told

I.B. was not receiving them. However, respondent continued to speak with I.B. by telephone.

¶ 15 Respondent further testified that, since he had been incarcerated in 2015, he had participated in an anger management program, narcotic abuse classes, alcohol abuse classes, and parenting classes. However, he had been unable to complete any of the courses because, each time he started, he would be transferred to a different penal institution. Respondent testified that at his current facility he was participating in counseling and was on a wait list to take other courses. Although respondent acknowledged he had committed five felonies, he testified he intended to "get on the right path" following his anticipated release in 2021 to ensure I.B. would not "follow[ ] the path that [respondent] [had] been following."

¶ 16 On March 28, 2019, the trial court entered an order finding respondent unfit to parent I.B. in that respondent had "failed to show a reasonable degree of responsibility" for I.B., failed to make progress toward the return of I.B. during the time periods alleged by the State, and was depraved.

¶ 17 On November 21, 2019, the trial court entered an order finding it was in the best interest of I.B. that respondent's parental rights be terminated.

¶ 18 This appeal followed.

¶ 19 II. ANALYSIS

¶ 20 On appeal, respondent argues the trial court's finding that respondent was unfit was against the manifest weight of the evidence.

¶ 21 Pursuant to the Juvenile Court Act of 1987 (705 ILCS 405/2-29(2) (West 2016)), a trial court may terminate parental rights where it finds that a parent is unfit based on grounds set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2016)) and that termination is

in the minor's best interest. *In re M.I.*, 2016 IL 120232, ¶ 20, 77 N.E.3d 69. On review, the court's determination that a parent is unfit will not be disturbed unless it is against the manifest weight of the evidence. *Id.* ¶ 21. A court's decision "is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent." *Id.*

¶ 22 In this case, the trial court determined respondent was unfit based on four of the grounds alleged by the State. However, we need only consider whether any single ground of unfitness was sufficiently proven. See *In re Donald A.G.*, 221 Ill. 2d 234, 244, 850 N.E.2d 172, 177 (2006) ("Although section 1(D) of the Adoption Act sets forth numerous grounds under which a parent may be deemed 'unfit,' any one ground, properly proven, is sufficient to enter a finding of unfitness."). Here, the record sufficiently supports the court's finding that respondent was depraved pursuant to 750 ILCS 50/1(D)(i) (West 2016).

¶ 23 "Depravity" is defined as " 'an inherent deficiency of moral sense and rectitude.' " *In re J.A.*, 316 Ill. App. 3d 553, 561, 736 N.E.2d 678, 685 (2000) (quoting *Stadler v. Stone*, 412 Ill. 488, 498, 107 N.E.2d 696, 701 (1952)). Section 50/1(D)(i) of the Adoption Act states that "[t]here is a rebuttable presumption that a parent is depraved if the parent has been criminally convicted of at least 3 felonies *** and at least one of those convictions took place within 5 years of the filing of the petition *** seeking termination of parental rights." 750 ILCS 50/1(D)(i) (West 2016). A parent may rebut a presumption of depravity "with proof of rehabilitation or with evidence that the circumstances surrounding the crimes show the crimes did not result from depravity." *In re T.T.*, 322 Ill. App. 3d 462, 466, 749 N.E.2d 1043, 1046 (2001). "[O]nce evidence opposing the presumption comes into the case, the presumption ceases to operate, and the issue is determined on the basis of the evidence adduced at trial as if no presumption had ever existed."

*J.A.*, 316 Ill. App. 3d at 562.

¶ 24        In this case, the State provided evidence of respondent's five felony convictions, one of which occurred in 2016, less than five years prior to the date the State filed its motion to terminate respondent's parental rights. Thus, the State established a rebuttable presumption of depravity.

¶ 25        Respondent argues he rebutted the presumption of depravity by presenting evidence that he has "ma[d]e significant changes in his outlook on life." Specifically, respondent contends his participation in counseling and anger management, plans for employment and housing after his release, family network committed to assisting him upon his release, and commitment to I.B. and "showing him the right path" all militate against the trial court's finding. We find respondent presented insufficient proof of his rehabilitation and thus failed to rebut the presumption of depravity.

¶ 26        It has been held that rehabilitation "can only be shown by a parent who leaves prison and maintains a lifestyle suitable for parenting children safely." *In re Shanna W.*, 343 Ill. App. 3d 1155, 1167, 799 N.E.2d 843, 852 (2003); see also *In re Addison R.*, 2013 IL App (2d) 121318, ¶ 30, 989 N.E.2d 224 ("Notwithstanding respondent's argument to the contrary, her efforts in prison, while commendable, were insufficient evidence of rehabilitation or lack of depravity."). Here, respondent was unable to establish evidence of rehabilitation because he has been incarcerated throughout the pendency of this case. While respondent testified about certain classes he has taken while in prison and his visits with I.B., the trial court found that respondent has not shown "evidence that he has rehabilitated himself, that he can be in the community and show that he will comply with the laws of the community, the laws of this state." Based on the

record, we cannot conclude the court's finding that due to his depravity, respondent was unfit to parent I.B. was against the manifest weight of the evidence.

¶ 27 We note the record also supports the court's finding that respondent was unfit because he failed to maintain a reasonable degree of responsibility for I.B.'s welfare. The language of section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2016)) is disjunctive and failure to maintain a reasonable degree of responsibility may be considered on its own, exclusive of proof of respondent's interest or concern, as a basis for unfitness. *In re C.E.*, 406 Ill. App. 3d 97, 108, 940 N.E.2d 125, 136 (2010). Here, despite respondent's visits and calls with I.B., as well as the letters and gifts he sent during his incarceration, respondent's commission of crimes and his resulting incarceration prevented him from maintaining a reasonable degree of responsibility for the care and custody of I.B. Respondent was not even aware DCFS had taken custody of I.B. until 2017, despite the telephone conversations he had with I.B. during 2016. Even when respondent was not in prison, he only saw I.B. "once in a while," only visiting I.B. two times in all of 2015.

¶ 28 III. CONCLUSION

¶ 29 For the reasons stated, we affirm the trial court's judgment.

¶ 30 Affirmed.