2023 IL App (1st) 221831-U
Order filed July 27, 2023

FIRST DISTRICT
FOURTH DIVISION

No. 1-22-1831

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* Ye. G., a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| Appellee, | ) | Cook County. |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | Nos. 18 JA 393 |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Marcus L., | ) | Honorable |
| | ) | Bernard Sarley, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Justices Hoffman and Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm the trial court's orders where its findings that the father was unfit and that it was in the minor's best interest to terminate his parental rights were not against the manifest weight of the evidence.

¶ 2    Respondent, Marcus L., appeals from the trial court's orders finding him unfit as a parent as defined in sections 1(D)(b) and (n) of the Adoption Act (grounds (b) and (n)) (750 ILCS 50/1(D)(b), (n) (West 2020)) and pursuant to section 2-29 of the Juvenile Court Act of 1987 (705

ILCS 405/2-29 (West 2020)) and terminating his parental rights to his minor daughter, Ye. G. We affirm the trial court's finding that respondent was unfit under ground (b) and the order terminating his parental rights.

¶ 3    Respondent is the biological father of Ye. G., born on May 12, 2014 to Sylvia G. (the mother). The mother and Ye. G. lived in Arizona with Ya. G., the mother's son; they moved to Illinois in December 2017. During the proceedings, the mother gave birth to D.G. Respondent, at all times, lived in Georgia and is not the father of Ya. G. or D.G.[1]

¶ 4    On April 25, 2018, the State filed a petition for adjudication of wardship of Ye. G. against respondent and the mother, which contended that Ye. G. was neglected pursuant to section 2-3(1)(b) [injurious environment] and abused pursuant to section 2-3(2)(ii) [substantial risk of physical injury] of the Juvenile Court Act (705 ILCS 405/2-3(1)(b), (2)(ii) (West 2018)), and a motion for temporary custody. As to the petition and motion, the State alleged:

> "Mother has one prior indicated report for cuts, bruises, welts, abrasions, and oral
> injuries. Mother has two minors not in her care and one other minor who was in
> [Department of Children and Family Services (DCFS)] custody with findings of abuse,
> neglect, physical abuse, excessive corporal punishment, and unfitness having been entered.
> Mother admits to posting on Facebook around April 23, 2018 that she would kill herself
> and her children due to feeling extremely overwhelmed. Mother states that she wanted
> someone else to care for her children. Putative father's whereabouts are unknown and

---

[1] The mother's parental rights were also terminated in the proceedings below. In the mother's appeal (no. 1-22-1883), her attorney has filed a motion to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967). Ya. G., born on October 30, 2012, and D.G., born on August 25, 2018, are not parties to this appeal. We include facts relating to them as relevant to the orders which are being challenged by the father on appeal.

paternity has not been established."

The State supported these factual allegations with the affidavit of a DCFS investigator who also averred that the mother did not provide housing or medical care for Ye. G.

¶ 5    That day, the trial court entered orders granting temporary custody of Ye. G. to DCFS and appointing her a guardian *ad litem* (GAL). Ye. G. was placed with Ya. G. in a home of fictive kin.

¶ 6    On May 22, 2018, the trial court entered an order requiring respondent to submit to a DNA test on or before June 18, 2018. Subsequently, on July 18, 2018, respondent submitted to the DNA test and, on August 2, 2018, the court entered an order finding that, based on the results of that test, respondent is the father of Ye. G.

¶ 7    A June 8, 2018 integrated assessment report (2018 assessment), prepared by Volunteers of America (VOA),[2] was filed in the trial court. During the mother's assessment interview, she explained that she had a "casual" relationship with respondent when she was 17 years old. After not seeing each other for about five years, they reconnected while respondent "was on a break from his paramour" and Ye. G. was conceived. Respondent had never met Ye. G. because he did not want his paramour to know about Ye. G. and referred to Ye. G. as his "best kept secret." Respondent told the mother to tell Ye. G. that "he died in the war." He did not want to pay child support and so had not provided financial assistance.

¶ 8    The 2018 assessment revealed that the caseworker was unable to contact respondent. It was recommended that he make himself available for an interview and if it was established that he is the father, VOA should assess the appropriateness of visitation with Ye. G. The January 2019 service plan stated that respondent had not yet been interviewed. According to the April 2019

---

[2] VOA was the agency monitoring the case for DCFS.

service plan, respondent's interview was achieved on April 10 and he was required to complete a Juvenile Court Assessment Program (JCAP) drug assessment and engage in parenting classes and coaching, individual therapy, and child and parent psychotherapy.

¶ 9      On April 24, 2019, the trial court entered an adjudication order finding that Ye. G. was neglected due to an injurious environment. On May 21, 2019, the court entered a dispositional order finding that respondent was unable to care for, protect, train, or discipline Ye. G. and that it was in Ye. G.'s best interest to adjudicate her a ward of the court.

¶ 10     In October 2019, DCFS filed a permanency report prepared by De-Aundra Kerby, a caseworker for VOA. This report explained that respondent had expressed a willingness to be with Ye. G., but was not consistent in maintaining contact. He reported financial difficulties in paying for services. It was recommended, prior to any visitations, that Ye. G. discuss her feelings regarding respondent with a therapist and that respondent demonstrate his capacity to parent and to assure Ye. G.'s health, safety, and development. In December, DCFS filed a similar permanency report, but omitted respondent's financial difficulties.

¶ 11     After a permanency hearing on December 31, the trial court entered an order indicating that respondent was not present and set a permanency goal of return home within 12 months. The court found that that respondent had not made substantial progress and that DCFS had "made reasonable efforts in providing services to facilitate achievement of the permanency goal."

¶ 12     On January 13, 2021, DCFS submitted a permanency report, which stated that respondent had a copy of the service plan and was instructed on how to locate required services in his area. He had not provided any documentation that he was engaging in services. That same day, the court held a permanency hearing via Zoom. Respondent was not present. Marianne Pallozzi, a case manager for VOA, testified that she was assigned to this case in early December 2020 and

reviewed the casefile created by Kerby, who had no recent contacts with respondent. Pallozzi had not yet attempted to contact him. After the hearing, the court changed the permanency goal to "substitute care pending the court's determination on termination of parental rights" and found that respondent had "not consistently engaged in visitation or reunification services."

¶ 13    On September 2, 2021, the State filed a supplemental petition for the appointment of a guardian with the right to consent to adoption for Ye. G alleging that respondent was unfit under grounds (b), (c), (m), and (n) of the Adoption Act (750 ILCS 50/1D(b), (c), (m), (n) (West 2020)) and that a permanency goal of adoption was in Ye. G.'s best interest.

¶ 14    DCFS filed a permanency report in September 2021, stating:

"As a result of a Diligent Search letter sent on 4/5/21, [respondent] called this worker asking when [Ye. G.] could be moved to Georgia to live with him and his wife. [He] explained that the last he heard from the agency, they told him he was expected to complete services on his own ***. [Respondent] also told this worker that he did not have the money to pay for services and he had been getting the "run around" from [the Georgia DCFS] for any additional help. [Respondent] stated that he had never been contacted by the courts or his public defender about anything related to the case. The worker emailed [respondent] his service plan, instructions stating that he was responsible to find service providers in his state of residence, as well as the contact information for his public defender."

¶ 15    The trial court proceeded to a fitness hearing on October 28, 2022 via Zoom. Respondent appeared late, but his attorney was present from the beginning.

¶ 16    The State introduced a number of exhibits, which were admitted without objection, including: the 2018 assessment (see *supra*, ¶ 7-8), service plans from January, April (see *supra*, ¶ 8), and October 2019; April and October 2020; April and October 2021; and April and June

2022; and court reports from October and December 2019 (see *supra* ¶ 10) and January (see *supra* ¶ 12) and September 2021 (see *supra* ¶ 13). The relevant portions of the exhibits, not discussed above, are summarized below.

¶ 17    The September 2019 service plan indicated that the caseworker had mailed respondent a copy of the service plan and informed him that he was to find providers in Georgia. Respondent spoke with the caseworker about his attempts to find parenting classes, requested funding assistance, and explained that he was "diligently searching for free programs in his area." The April and October 2020 service plans noted that respondent was working with the Georgia DCFS to locate services. The April 2021 service plan stated that respondent had not communicated with the caseworker. The October 2021 service plan provided that respondent had minimal contact with the caseworker and "ha[d] not sent letters, cards, or pictures." The April and June 2022 service plans indicated that respondent had participated in a mediation in December 2021 to discuss visitations and it was agreed that respondent and the foster parents would first exchange information, pictures, and letters by email. The foster parents sent respondent an email, but he had not responded. Respondent had not provided documentation as to progress on services.

¶ 18    Kerby testified that she was assigned to this case from October 2018 to July 2020. In April 2019, after completing a diligent search to locate him, Kerby had a phone conversation with respondent about the case. Kerby explained that VOA wanted to work with respondent and that he would need to make himself available. Around the same time, Kerby conducted an assessment interview with respondent and he was recommended to engage in services. Kerby explained to respondent that he would need to locate providers in Georgia. When respondent asked for assistance, Kerby located a point of contact with the Georgia DCFS.

¶ 19    At times, respondent requested visitation with Ye. G. and sent letters. Due to the advice of

Ye. G.'s therapist and the "sensitive trauma" of the case, VOA did not allow visitations and did not deliver the letters to Ye. G. VOA needed to clinically staff these issues, which required input from Ye. G.'s therapist. However, Ye. G.'s therapy assignment had lapsed and by the time a new therapist was assigned, Kerby was on maternity leave.

¶ 20    On cross-examination by respondent, Kerby testified that respondent's assessment interview did not occur until April 2019, because, as instructed, she tried to interview him in-person. VOA did not offer transportation assistance for the interview. Kerby received emails from respondent and his attorney about respondent's attempts to engage with the Georgia DCFS. Respondent told Kerby that he provided her contact information to the Georgia DCFS, but she did not hear from them. In late 2019, respondent's attorney provided Kerby with an email address for a person from the Georgia DCFS. Kerby contacted that person but did not receive a response. When Kerby went on maternity leave, a temporary caseworker was assigned. After her maternity leave, Kerby had emails from respondent and his attorney seeking updates and informing her that respondent was employed, living with his "new family," and wanted Ye. G. to live with him.

¶ 21    Pallozzi testified that, after being assigned to this case, she completed a diligent search for respondent and sent him a letter in April 2021. Respondent called Pallozzi and asked when Ye. G. could move into his home and indicated that he was not engaging in services due to financial and communication issues. Pallozzi emailed him the service plan, but told him that since the goal had changed, he had to find his own services. Respondent stayed in regular contact with Pallozzi and communicated with the foster parents at least once. He did not give Pallozzi letters or pictures.

¶ 22    On examination by the GAL, Pallozzi testified that she was never in a position to allow visitations or recommend a permanency goal of return home. Respondent never made progress.

¶ 23    On cross-examination by respondent, Pallozzi testified that there were at least three prior

caseworkers, including a temporary caseworker, who had no contacts with respondent. She acknowledged that respondent had requested visitations.

¶ 24 Regina Ruffin, a supervisor for VOA, testified that she was assigned to the family in May 2022. She emailed respondent and he responded with a voicemail. Ruffin called respondent but received a notification that his voicemail box was full. She did not hear from him again. Respondent emailed the foster parents for updates. He did not send any letters, cards, or gifts.

¶ 25 On cross-examination by respondent, Ruffin testified that respondent attended a meeting in February 2022 and requested a visit with Ye. G., which VOA did not allow. Because of the permanency goal, Ruffin was not able to offer respondent services or visitations.

¶ 26 Respondent testified that he emailed Kerby contact information for the Georgia DCFS and she responded that she was no longer on the case. Pallozzi sent him the service plan and he had no recollection of Ruffin. He has not completed services, but has attended meetings, court hearings, and mediation. He sent Ye. G. letters and requested visitations.

¶ 27 Respondent "officially" knew that Ye. G. was his daughter when he "did the DNA test." In response to whether he was aware "prior to coming to court" for this case that he might have a child with the mother, he responded "Yes. But the distance between us both was always there. So literally, distance is what keeps me and [the mother] apart." The State asked if the mother told respondent about Ye. G. prior to her birth and respondent stated "I don't think it was before, but I think it was after [Ye. G.] was born." In response to being asked whether the mother told him shortly after Ye. G. was born, respondent testified "I'm horrible with dates, so I am going to say I don't know, if that's okay." He agreed that although he was aware that he had a child, he did not visit her or have any contact with her before 2018 when DCFS became involved.

¶ 28 He received the service plan from Pallozzi, but "couldn't" engage in services because

"One, I didn't understand and two, I didn't get any help with getting further understanding."

¶ 29 The State and the GAL requested findings of unfitness under grounds (b), (m), and (n).[3] As to grounds (n) and (b), the State, relying on the 2018 assessment, argued that respondent knew that Ye. G. could have been his daughter, but he did nothing until DCFS became involved.

¶ 30 Respondent argued that according to the record he "was not sure" that Ye. G. was his daughter until the DNA test results, but once he knew, he became active in the case and wanted to participate in services. However, despite his continued requests to visit with Ye. G., the State actively prevented him from beginning any visitations or communications with Ye. G. and that DCFS failed to assist him in finding and funding services.

¶ 31 The court orally found that the State proved, by clear and convincing evidence, that respondent was unfit under grounds (b) and (n), but did not prove, by clear and convincing evidence, ground m. Specifically as to ground (b) and (n) the court reasoned:

"As pointed out during rebuttal argument, according to the [2018 assessment], which is in evidence, [the mother] told [respondent] he was the father before the case came in, and that his response was he didn't want his girlfriend to know. Notwithstanding [his attorney's] argument regarding what the caseworker, caseworkers may have done or did not do while [respondent] was a party to the case, that particular fact proves to me by clear and convincing evidence [respondent] is unfit under [ground (n)] ***. The statute allows the Court to consider the time that the child was alive prior to coming into care ***.

For that exact same reason and based on that same evidence, the State has also proven [respondent] unfit under [ground (b)] failure to maintain a reasonable degree of

[3]The parties stipulated to the dismissal of ground (c).

interest, concern, or responsibility. Again, the court is allowed to consider the time before the case came into court."

The court entered a written order finding that respondent was unfit under grounds (b) and (n) and proceeded to a best interest hearing.

¶ 32    Emily Jarvis, a caseworker with National Youth Advocate Program (NYAP), testified that she was assigned to work with Ye. G. on September 13, 2022 after NYAP replaced VOA. Ye. G. and Ya. G. were placed in their current foster home in December 2020. Jarvis visits Ye. G. three times a month and found the placement to be safe; did not find any signs of neglect, abuse, or corporal punishment; and had no unusual incidents to report.

¶ 33    Ye. G. attends a private school as a third grader with an accommodation plan and is doing well. Her medical, dental, and vision exams are up to date. Ye. G. was diagnosed with ADHD, takes medication, and meets with a psychiatrist for medication monitoring. Ye. G. benefited from weekly individual therapy. Ye. G. and Ya. G. visit monthly with D.G.

¶ 34    Ye. G. is very bonded and has a loving relationship with the foster parents and calls them mom and dad. She looks to them for comfort and guidance and likes to joke and play. The foster parents advocate for Ye. G., schedule medical appointments, and make sure she attends school and has proper accommodations. Ye. G. wants to be adopted by the foster parents. NYAP recommended that it was in the best interest of Ye. G. to terminate respondent's parental rights and for the foster parents to adopt her.

¶ 35    On examination by the GAL, Jarvis testified that the foster parents recognized that Ye. G. needed specialized help and they were not able to meet her needs, so they advocated to have her assessed for "specialized" services. The foster parents have communicated with respondent by email and Jarvis believes they will continue to update respondent on Ye. G.

¶ 36   On cross-examination by respondent, Jarvis testified that she was not included on and has not read the emails between the foster parents and respondent. Jarvis had not discussed Ye. G.'s biological family with her. Ye. G. is aware that the foster parents are not her biological parents.

¶ 37   The foster parents testified that Ye. G. and Ya. G. have lived in their home for two years with their four-year-old foster son. They are committed to continuing Ye. G.'s relationship with D.G. and have sought out and located a number of services. The family attends church, goes to the library and local pool, is active outdoors, and spends time with extended family. The foster parents wish to adopt Ya. G. and Ye. G.

¶ 38   On cross-examination by respondent, the foster parents testified that Ye. G. knows that the foster parents are not her biological parents and that her biological parents love her but are unable to take care of her. The foster parents have been sending respondent emails with pictures and are willing to maintain contact with respondent and eventually help Ye. G. connect with her biological parents with the advice of Ye. G.'s therapist.

¶ 39   The GAL introduced a report from Ye. G.'s therapist, which was admitted without objection. The therapist recommended that, even though respondent is interested in obtaining custody of Ye. G., it would be better for Ye. G. emotionally and behaviorally to move forward. She and Ya. G. love their current environment and feel very safe. The therapist opined that it would not be productive and would result in significant behavioral and/or emotional deterioration to separate or relocate Ye. G. and Ya. G.

¶ 40   Respondent was not called as a witness but was allowed to make a statement under oath. He has a 22-year-old son and a 17-year-old daughter. Respondent has always lived 500 or more miles away from Ye. G., but after he received the DNA test results, he wanted to be a part of her life. He does not want to push the foster parents away.

¶ 41    The State and the GAL, over the objection of respondent, sought findings that it was in the best interest of Ye. G. for respondent's parental rights to be terminated. The court orally found, after considering all of the best interest factors, that it was in the best interest of Ye. G. to terminate respondent's parental rights and set a permanency goal of adoption. The court entered a written order terminating respondent's parental rights.

¶ 42    Respondent appeals arguing that the trial court's finding that he was an unfit parent was against the manifest weight of the evidence. Respondent seeks the reversal of the order terminating his parental rights but does not argue that the court's order finding that it was in Ye. G.'s best interest to terminate his parental rights was against the manifest weight of the evidence.

¶ 43    The Juvenile Court Act sets forth a two-step process for the termination of parental rights. 705 ILCS 405/2-29(2) (West 2020). The court must first find, by clear and convincing evidence, that a parent is unfit as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). *In re M.I.*, 2016 IL 120232, ¶ 20. The court next considers whether it is in the best interest of the minor that parental rights be terminated. *Id.*

¶ 44    The trial court found respondent unfit on grounds (b) and (n) of the Adoption Act (750 ILCS 50/1D(b) and (n) (West 2020)) determining, that he failed to maintain a reasonable degree of interest, concern, or responsibility as to Ye. G.'s welfare and that he evidenced an intent to forego his parental rights. Respondent argues that the State failed to prove either ground and therefore the court's findings were against the manifest weight of the evidence.

¶ 45    Any ground enumerated in section 1(D) of the Adoption Act is enough to support a finding of unfitness. *In re C.W.*, 199 Ill. 2d 198, 210 (2002). We will not reverse a finding of unfitness unless it is against the manifest weight of the evidence, if "the opposite conclusion is clearly apparent." *M.I.*, 2016 IL 120232, ¶ 21. This court may affirm on any basis in the record, and we

need not review all grounds for a finding of unfitness if we uphold the findings as to one ground. *In re D.H.*, 323 Ill. App. 3d 1, 9 (2001). We begin our analysis with the finding under ground (b).[4]

¶ 46    Section 1(D)(b) of the Adoption Act provides that a person may be found unfit for "[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." 750 ILCS 50/1(D)(b) (West 2020). Any of the three elements may be considered on its own as a sufficient basis for unfitness. *In re C.E.*, 406 Ill. App. 3d 97, 108 (2010). Ground (b) has no time constraint that limits our consideration of respondent's fitness. *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 21. During the fitness stage, a parent's "past conduct is under scrutiny." *In re Davon H.*, 2015 IL App (1st) 150926, ¶ 71 (citing *In re D.M.*, 336 Ill. App. 3d 766, 771-72 (2002)).

¶ 47    Ground (b) focuses on the reasonableness of a parent's efforts and takes into account their difficulties and circumstances. *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004). A parent's relevant circumstances include "difficulty in obtaining transportation, the parent's poverty, statements made by others to discourage visitation, and whether the parent's lack of contact with the children can be attributed to a need to cope with personal problems rather than indifference towards them." *C.E.*, 406 Ill. App. 3d at 108-09. A parent's failure to have any contact with the minor from the date of her birth, to provide any financial support, and to express any interest in the minor's welfare supports a finding that the parent failed to demonstrate a reasonable degree of interest, concern, or responsibility for the minor's welfare. *In re Tinya W.*, 328 Ill. App. 3d 405, 409 (2002).

¶ 48    Based on the record, we cannot conclude that the trial court's finding that respondent was unfit under ground (b) was against the manifest weight of the evidence.

¶ 49    During the mother's 2018 assessment interview, she revealed that she and respondent

---

[4] The trial court found that the State failed to prove ground (m) (750 ILCS 50/1D(m) (West 2020) by clear and convincing evidence.

resumed a relationship at a time when he was on a break from his paramour and the mother became pregnant with Ye. G., her fourth child. When the mother told him about Ye. G., respondent said that he did not want his paramour to know about Ye. G. and preferred that the mother tell Ye. G. he died in the war. Respondent referred to Ye. G. as his best kept secret.

¶ 50 In his testimony, respondent did not dispute that he had sexual relations with the mother and acknowledged that the mother made him aware of Ye. G. sometime after Ye. G.'s birth and prior to the court proceedings. The evidence established that respondent had reason to know that he was the father of Ye. G. See *In re Adoption of A.S.V.*, 268 Ill. App. 3d 549, 559 (1994) (explaining that a father would have reason to know that he was the father because he knew that he had sexual intercourse with the mother around the time she would have conceived the child and that they were capable of conceiving children together, since they both were already parents).

¶ 51 Respondent's first act of responsibility for Ye. G. was to submit to a DNA test and that action was only done after a court order when Ye. G. was already four years old. There is no evidence that prior to that step, respondent contacted Ye. G., made attempts to see her, provided financial support for her, or inquired as to her wellbeing.

¶ 52 Respondent argues that it is not clear from the record when he learned about Ye. G. and therefore it was improper for the court to consider his conduct prior to these proceedings. He asserts that the mother could have told him just a short time before the case was filed. However, at the hearing, respondent provided only vague and evasive testimony as to when the mother told him about Ye. G. He also asserted that there was "always" geographical distance between them which kept them apart. During the fitness hearing, when asked whether he was told only a short time after Ye. G.'s birth, he answered that he was "horrible with dates." It is far more likely that respondent knew about Ye. G. closer in time to her birth than to the commencement of this

proceeding. Although the evidence did not establish an exact date as to when the mother told respondent about Ye. G., this does not change the fact that there is no evidence whatsoever that respondent showed any concern, interest, or responsibility for Ye. G. at any time prior to the filing of the petition for adjudication.

¶ 53    Even if he had been informed of Ye. G., just a short time before the filing of the petition, as discussed, ground (b) does not have time restrictions. *Nicholas C.*, 2017 IL App (1st) 162101, ¶ 21. And if respondent did learn about Ye. G. in a time period just before this case began, he did not then take any responsibility or show any interest or concern for Ye. G. even though he would have known Ye. G. was almost four years old based on the timeline of his relationship with the mother. And, as discussed, even in the time period immediately after the petition was filed, respondent's only act of responsibility was to submit to the court ordered DNA test. Respondent then continued to lack concern, interest, or further responsibility for Ye. G. until the court made its paternity finding which was almost four months after the petition's filing. See *Tinya W.*, 328 Ill. App. 3d at 409 (finding that a father, even though unaware of his paternity, failed to demonstrate a reasonable degree of interest, concern, or responsibility). In his testimony, respondent confirmed that although he was aware that he had a child, he did not visit or contact her before DCFS became involved with the case. If we were to consider only the time period from just before the petition was filed and through the finding of paternity, we would conclude that the ground (b) finding was supported by the manifest weight of the evidence. See *Jaron Z.*, 348 Ill. App. 3d at 259 ("a parent is not fit merely because [he] has demonstrated some interest or affection toward [his] child; rather [his] interest, concern and responsibility must be reasonable").

¶ 54    Respondent argues that the 2018 assessment was "insufficiently robust by itself to carry the State's burden of proof" because it was "never substantiated or tested or even explained."

Respondent cites no authority in support of his argument and has forfeited this argument. See *Palm v. 2800 Lake Shore Drive Condominium Assoc.*, 401 Ill. App. 3d 868, 881 (2010) (citing Il. S. Ct. R. 341(h)(7) (eff. May 25, 2018)). Forfeiture aside, we cannot say that the trial court erred in considering the 2018 assessment. See *In re Faith S.*, 2019 IL App (1st), ¶ 78 ("We *** defer to the trial court's factual findings and credibility assessments, and will not reweigh evidence anew on appeal. [Citations.]"). Further, the 2018 assessment was entered into evidence without objection and the mother's statements that she told respondent about Ye. G. and that he showed no interest in her were not contradicted by respondent's testimony or by the other evidence in the record.

¶ 55    We conclude that the trial court's finding under section 1(D)(b) was not against the manifest weight of the evidence and we affirm its determination that respondent was unfit. See *Daphnie E.*, 368 Ill. App. 3d at 1064 (a finding of unfitness will stand if supported by any one of the statutory grounds).

¶ 56    Respondent argues that DCFS violated his due process rights where they failed to provide him with reunification services and visitations as required under 325 ILCS 5/8.2 (West 2020). However, this argument relates more to the grounds (n) and (m) allegations which we do not address. And as to ground (b), we have found that the trial court's finding is supported by the evidence as to respondent's total lack of concern, interest, and responsibility for Ye. G. prior to DCFS's involvement in reunification services and visitations (after the finding of paternity) and therefore we need not consider this argument.

¶ 57    We next turn to the trial court's determination that it was in Ye. G.'s best interest that respondent's parental rights be terminated. Respondent asks that we reverse the order terminating his parental rights because the finding of unfitness was in error. He does not present any argument which directly challenges the best interest finding on appeal and therefore any challenges are

forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Forfeiture aside, we would affirm the termination of respondent's parental rights.

¶ 58 The State must prove by a preponderance of the evidence that termination is in the best interest of the minor and the trial court's findings will not be overturned unless they are against the manifest weight of the evidence. *In re D.T.*, 212 Ill. 2d 347, 367 (2004).

¶ 59 The court's determination that it was in Ye. G.'s best interest to terminate respondent's parental rights was not against the manifest weight of the evidence. The record shows that Ye. G. has been with the foster parents for at least two years. Ya. G. is also in the home. Jarvis, the current caseworker, testified that she visited the foster home on a weekly basis and found that it was safe and appropriate. She did not observe signs of abuse, neglect, or corporal punishment and there had been no unusual incidents regarding the foster parents' care of Ye. G. The foster parents actively sought out services for Ye. G., ensured that she received her medications and attended her medical appointments, and were involved in her education. Ye. G. is bonded with both foster parents, their extended family, their third foster child, and Ya. G. Ye. G. visits with D.G. regularly and the foster parents are committed to continuing this relationship.

¶ 60 Additionally, the foster parents have expressed a desire to adopt Ye. G. with Ya. G. Ye. G. calls the foster parents "mom" and "dad" and had a positive reaction when asked if she wanted to be adopted by the foster parents. Although respondent expressed an interest in having a relationship with Ye. G., the evidence demonstrated that he has never been involved in her life. The trial court's best interest finding is not against the manifest weight of the evidence and supports the order terminating respondent's parental rights.

¶ 61 We affirm the judgment of the trial court.

¶ 62 Affirmed.