NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 241027-U

NO. 4-24-1027

IN THE APPELLATE COURT

FILED
December 16, 2024
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* A.S., a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Petitioner-Appellee, | ) | No. 22JA255 |
| v. | ) | |
| Alexia W., | ) | Honorable |
| Respondent-Appellant). | ) | Karen S. Tharp, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Justices Harris and Zenoff concurred in the judgment.

**ORDER**

¶ 1     *Held*: The trial court's findings that respondent was unfit and that termination of her
parental rights was in the best interest of her child were not against the manifest
weight of the evidence; trial counsel's assistance was not ineffective.

¶ 2     Respondent Alexia W. is the mother of A.S., a minor (born in 2022). In December
2022, the State filed a petition for adjudication of wardship of A.S. pursuant to section 2-3(1)(a)
and (b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(a), (b) (West
2022)), who was subsequently adjudicated to be neglected and made a ward of the court. In June
2024, the trial court found that respondent was an unfit parent pursuant to section (1)(D)(b) and
(m)(i)-(ii) of the Adoption Act (750 ILCS 50/(1)(D)(b), (m)(i)-(ii) (West 2022)) and that it was in
A.S.'s best interest that her parental rights be terminated.

¶ 3        Respondent timely appeals, claiming the trial court's fitness and best-interest findings were against the manifest weight of the evidence. She further claims that her appointed counsel was ineffective.

¶ 4        For the reasons set forth below, we affirm.

¶ 5                                    I. BACKGROUND

¶ 6                A. Prior Cases Involving Respondent's Three Older Children

¶ 7        Respondent's three older children were the subject of prior separate actions (Sangamon County case Nos. 20-JA-285, 21-JA-15, and 21-JA-16). In the November 2020 initial integrated assessment plan for those cases, the Illinois Department of Children and Family Services (DCFS) noted the following as to why the initial cases against respondent were opened:

> "On 7/25/20 SCR#2430052 was indicated against [respondent] for allegation 79D-inadequate supervision. [Respondent] was indicted for this allegation when [her eldest child] left the home and roamed to a busy street which was about a block from home. [The minor] was missing for about an hour before he was found and brought back home by a neighbor. This incident occurred all while [respondent] was asleep and had no idea that [the minor] had left the home."

¶ 8        The report further stated that respondent "did not seem to take the safety threat of the minor's lack of supervision too seriously" and that she viewed the child's lack of supervision as "a one[-]time incident."

¶ 9        Respondent was ultimately found unfit, and her parental rights as to her three older children were terminated in June 2023.

¶ 10                                    B. Initial Filing

¶ 11        A.S. was born on December 9, 2022. Four days later, a petition was filed asserting

that A.S. was neglected in violation of section 2-3(1)(a) and (b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(a), (b) (West 2022)). According to the petition, (1) "the minor [was] not receiving the proper care and supervision necessary for her wellbeing in that [respondent] *** failed to make a proper care plan for the minor's supervision," (2) "the minor's environment [was] injurious to her welfare as evidenced by the minor's siblings being adjudicated neglected" and respondent's "failure to make reasonable progress towards having the child returned home," and (3) "the minor's siblings remaining in the care of DCFS" in the three sibling cases.

¶ 12    A shelter care order was entered the same day, noting the trial court's finding that A.S. was "neglected upon hearing evidence." According to the order, there had been a "prior abuse/neglect history with siblings and no progress on services."

¶ 13                    C. Adjudication of Neglect

¶ 14    A.S. was adjudicated neglected on March 30, 2023, based on respondent's failure to make reasonable progress in the cases involving her three older children. The trial court found as follows: "[Respondent]'s 3 other children in care of DCFS" and she "has not made sufficient progress to have those minors returned to her care."

¶ 15                    D. Dispositional Order

¶ 16    As reflected in the April 2023 dispositional order, the trial court found it was in A.S.'s best interest that she be made a ward of the court. The court also found that A.S.'s "parents [were] unfit, unable or unwilling for some reason other than financial circumstances alone to care for, protect, train, educate, supervise[,] or discipline the minor." The order required that the "parents must cooperate with recommended services including counseling, [substance] abuse services, parenting, [and] non-violence services."

¶ 17                    E. Motion for Termination of Parental Rights

¶ 18    On March 19, 2024, the State filed a motion for termination of parental rights, asserting in paragraph nine that respondent was unfit for the following reasons:

(a) Failing to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare;

(b) Failing to make reasonable efforts to correct the conditions which were the basis for the minor's removal within nine months following the adjudication of neglect, specifically, March 30, 2023, to December 30, 2023;

(c) Failing to make reasonable progress toward the return of the minor to her within nine months following adjudication of neglect, specifically, March 30, 2023, to December 30, 2023;

(d) Failing to make reasonable efforts to correct the conditions which were the basis for the removal of the minor from her during any nine-month period following the adjudication, specifically, May 30, 2023, to February 29, 2024; and

(e) Failing to make reasonable progress toward the return of the minor to her during any nine-month period following adjudication, specifically, May 30, 2023, to February 29, 2024.

See 750 ILCS 50/(1)(D)(b), (m)(i)-(ii) (West 2022).

¶ 19    The motion for termination of parental rights also named A.S.'s putative father and any "unknown father"; the father is not a party to this appeal.

¶ 20                                    F. Fitness Hearing

¶ 21    The State's motion to terminate parental rights was called for hearing on June 27, 2024, at which time four witnesses testified. The father's testimony is not discussed, as it does not relate to this appeal.

¶ 22                                    1. *Nakira Powers*

¶ 23        Nakira Powers, a supervisor with the Center for Youth and Family Services and a former caseworker on A.S.'s case, had been a caseworker for A.S.'s older siblings' cases since March 2022. She was assigned to A.S.'s case in July 2023. Powers said that a service plan for the parents had already been developed in the three prior cases and that the services that respondent needed to engage in for A.S. were substantially the same as they were for her other children.

¶ 24        Powers said the areas of services for respondent included "parenting, substance abuse, mental health, [domestic violence], cooperation, and visitation." Concerning respondent's mental health services, Powers said that when she took over the file, respondent "had been engaged in mental health services but had been dropped from the services *** at least three to four times due to nonengagement." She added that, by April 2023, respondent still had not completed the mental health services. She also said that respondent had not provided her with any verification that she had met the counseling service requirement. Powers said that during the time she was assigned to the case, respondent "had at least six to seven referrals for mental health services," but as of the date of the hearing, she was not engaged in any mental health services.

¶ 25        Powers said she had spoken with respondent "over the years" and that respondent had "encountered a lot of trauma of her own that she still hadn't addressed." Respondent told Powers that she "continued to have children in order to fill that void of losing her mom." Powers added, "So I believe that there's still a lot of underlying trauma that [respondent] needs to address in order to be able to parent her children. So I think it would be beneficial for her to have engaged in mental health services to address that trauma."

¶ 26        Concerning substance abuse services, Powers said respondent had completed the first part of the required program assessment but not the second part. She stated that respondent

had used cannabis, but Powers had no knowledge that respondent used other drugs. Although respondent had completed the parenting services program, Powers said, "[I]t's been hard to actually physically see her interact as a mother with [A.S.]" because she had been inconsistent with her visits.

¶ 27 Concerning visitation, Powers said that respondent was scheduled for two-hour visits every Monday. Out of approximately 52 visits offered to her since A.S.'s birth, respondent made a total of only 8, which is roughly a 13% attendance rate. Respondent was late for some of the eight visits and left early from others.

¶ 28 When asked if respondent had voiced concern over barriers to engaging in visitation, Powers said that respondent had said she had transportation issues because she was living in Missouri. According to Powers, "We offered gas cards to [respondent's mother] to bring [respondent] here. If [respondent's mother] was not available, [we] offered [respondent] to set her up with a train ride through the agency to bring her here for visits every Monday." Powers said respondent used the gas card once, although it was offered for each visit, but she did not avail herself of the train. According to Powers, "She just had to reach out to me in advance to let me know that she would be attending the visit; that way, I could reach out to our financial department to get the train ride set up." Powers agreed that other than completing the parenting service plan, respondent had not been cooperative in engaging in services throughout the life of the case.

¶ 29 Powers said the foster parent tried to facilitate the visitations with respondent. She explained,

"[The foster parent] reaches out to [respondent] almost on a monthly basis to set up visitations with her and on holidays such as the kids' birthdays, Easter, Mother's Day, always attempting to engage [respondent] into visits and continued

communication through phone if she'd like to speak with them on the phone, anything to make sure that they maintain a bond with [respondent]."

¶ 30         Powers said that as of the date of the June 2024 hearing, respondent had not been consistently engaging in visitation with the foster parent. She testified, "I speak with [the] foster parent on a monthly basis and get updates as far as has she facilitated any visits for [A.S.] with [respondent], things like that, any conduct through text messages, phone calls. Foster mom informs me of all of those visitations that she has with [respondent]."

¶ 31         Regarding respondent's domestic violence services, Powers said that there were "previous reports of [domestic violence]" and that respondent had "informed that she was in a domestic violence relationship with [the father] that prevented her from engaging in services." Powers stated that to her knowledge, respondent was not living with the father at the time of the hearing. She added, '[T]hey're both homeless." Powers explained respondent "informed [her] that she *** doesn't have a stable placement and that she has been couch-surfing, and [another caseworker] has spoken with [the father] who has stated that he has not, he doesn't have a stable place to live either." Powers did acknowledge that respondent had begun courses at Sojourn, a domestic violence service provider, as of March 2024, having attended at least six classes.

¶ 32                                         2. *Respondent*

¶ 33         Respondent testified that she currently lives in Springfield, Illinois, with her cousin and that she was supposed to start employment with a local motel. She acknowledged having completed her parenting classes and said she was, at the time of the hearing, engaged in domestic violence classes with Sojourn. She said she did not set up any further mental health assessments because someone said she was not required to do so. She said she had problems getting to and from visitations, stating, "I didn't have rides to the visits, and sometimes when I did have rides,

I'd be late." She said she felt she had a bond with her daughter and that she loved her and did not want her parental rights terminated. She also claimed that she had made more than eight visits but offered no documentation to establish those claims.

¶ 34                    3. *DCFS Reports and Court Files*

¶ 35         The State admitted into evidence without objection People's group exhibit 1, which consisted of copies of the integrated assessment and all service plans relating to the minors' cases. The DCFS "child subjects of plan" report, which arose out of respondent's April 2023 evaluation, observed:

> "[Respondent] has made little to no progress towards the goal [of returning A.S. home within 12 months]. She has not maintained housing and reports that she is currently residing with a friend in Springfield, IL. She has not been communicating with worker consistently. She reports that she is working but has not provided proof of employment."

¶ 36         The October 2023 DCFS "child subjects of plan" evaluation stated:

> "[Respondent] has made little to no progress towards the goal [of returning the minor home within 12 months]. She has not maintained housing and reports that she has moved back to Missouri. She has not been communicating with worker consistently. She reports that she is working but has not provided proof of employment."

DCFS's caregiver subjects report made similar observations, stating:

> "[Respondent] has lacked communicates [*sic*] with this worker and previous worker to scheduled monthly visit. She has failed to attend scheduled child and family meetings, and has rescheduled parent-child visits. During the last reporting

period[,] [respondent] has visited with [A.S.] for 6-8 hours."

¶ 37     It further stated:

"[Respondent] has made minimal to no progress with engagement in services over the last reporting period. [Respondent] needs to provide a stable home environment for [A.S.] to be returned home to and she needs to be financially stable. She has been struggling to get and maintain a job, housing, and she *** has visited with [A.S.] for 2-4 hours during last reporting period."

¶ 38     Finally, the DCFS report reflecting respondent's most recent evaluation in April 2024, observed:

"During this reporting period there continues to be a lack of engagement in all services from [respondent]. The agency has attempted to engage [respondent] in services and continue to address the concerns that remain within this case and there continue to be little follow through. [Respondent] is currently residing in Springfield and her housing situation has been unstable. [She] was referred to counseling services through the agency but was dropped due to lack of engagement. She started the substance abuse assessment but failed to show up for the second portion of the assessment. She stated that it was due to her being kicked out of her placement at the time. Worker referred [respondent] to [different] shelter programs to help prevent her from being homeless. On 04/29/2024, [respondent] reported to worker that she had completed a mental health assessment and provided worker with proof. As of 04/18/2024 [respondent] was not recommended services for mental health. She has started engagement in [domestic violence] services with Sojourn and is meeting with them" on Tuesdays.

Respondent's May 1, 2024, assessment noted that she was pregnant and had not notified DCFS.

¶ 39 The State also requested the trial court take judicial notice of the case files of each of respondent's other three children (Sangamon County case Nos. 20-JA-285, 21-JA-15, and 21-JA-16), which the court did. Those files do not appear to be part of the record on appeal.

¶ 40                                    4. *Court Ruling on Parental Fitness*

¶ 41 At the conclusion of the fitness hearing, the trial court found that the State had met its burden of demonstrating by clear and convincing evidence that both parents were unfit. The court went through several factors specific to respondent. The court stated that substance abuse was "not a concern for me." Noting that respondent had completed only half of a substance abuse assessment, "it never seemed to be an issue, so that's not something I'm focusing on." Concerning domestic violence, the court observed that there was an older child who "was adjudicated based upon ongoing domestic violence." The court noted that respondent "did not start domestic violence classes until March of '24, so that is clearly past the two nine-month time periods that are listed." The court stated, "[I]t's very clear [respondent is] struggling and needs some support, needs to work through these issues. She's been through a lot." The court continued, "It's clear that she's struggling, and that was the hope of getting her involved in the mental health services for that support. She started numerous times, then never finished."

¶ 42 The trial court also addressed the issue of visitation, stating, "She made a decision to go to Missouri. Obviously maybe that was where she had support, but obviously, it was moving away from her child." The court continued, "But services were offered to her or the—not just gas cards. *** But they offered train tickets. She would not be responsible for finding a ride. They were offering her a train ticket from Missouri to Springfield to visit with her child." The court explained further, "And to only have eight visits in, and that's even the ones that where the foster

- 10 -

parent was reaching out to try and supplement that. It [was] just, eight total."

¶ 43    Accordingly, the trial court found the State had,

> "shown by clear and convincing evidence that [respondent] failed to maintain a reasonable degree of interest, concern, or responsibility. She's waited here till just as of late to get involved in probably the most important service, being the domestic violence, again, not even accounting for the mental health which I think would be extremely beneficial to her. She's failed to make reasonable efforts or reasonable progress through the nine-month periods that are listed, March '23 to December '23 and May of '23 to February '24, again, with only engaging in the important service in March of '24."

The court added, "During those time periods, even at the end of December, at the end of February, I would not have been close to being able to place [the minor] in the care of [respondent]."

¶ 44    A written order was entered that same day.

¶ 45                    G. Best-Interest Hearing

¶ 46                        1. *Testimony*

¶ 47    A best-interest hearing was held immediately following the termination of parental rights hearing on June 27, 2024. In the written order for that hearing, it was noted that respondent "was present for a few minutes [and] left before the State's first witness concluded her testimony." At the outset of the hearing, the State requested the trial court take judicial notice of Powers's testimony from the fitness hearing, which it did. Powers then testified that she had spoken with the foster parent and had observed A.S. in the foster parent's care. Powers said that A.S.'s twin sisters lived with the foster parent and the foster parent's daughter. Powers said that A.S. had been placed with the foster parent since she left the hospital shortly after her birth.

- 11 -

¶ 48      According to Powers, A.S. was "doing great" in foster care. Powers had "[n]othing but positive things to say regarding the foster home that [A.S.] is in." She said the foster parent had "been providing financially for [A.S.] regarding daycare, her clothing, birthdays, anything that she needs, food. She's been doing that without any, you know, needing any support from us. She'd done a great job at it." Power said the foster parent was willing to adopt A.S. and had signed a permanency commitment form. She said the foster parent had been providing for all of A.S.'s emotional needs and was "[v]ery compassionate and loving and well[-]bonded with [A.S.]" She said that A.S. was comfortable there, was well-bonded to her foster parent, and "connected with her sisters." She added that A.S. was able to visit her brother, who lived with another foster parent, A.S.'s foster parent had committed to ensuring that A.S. was active and involved, and her foster parent was open to respondent having a role in the child's life.

¶ 49                    2. *Court Ruling on Best Interest*

¶ 50      The trial court concluded that the State had met its burden of proving that respondent's parental rights should be terminated. According to the court, all of A.S.'s "needs are being met in the current foster home. Food, clothing, shelter." The court observed that A.S. was "in a home with siblings" and that the "[f]oster parent is open to maintaining contact with both [respondent] and father, has reached out apparently to [respondent] to maintain and help facilitate visits, has allowed visits between [A.S.] and [her brother]."

¶ 51      It further found:

> "The child, from all appearances, feels love, attachment, [and a] sense of being valued and loved in the current home. Her sense of security would appear to be in her current home, her sense of familiarity. I'm to consider the least disruptive placement and alternative. This is the only home this child has ever known. She

went home from the hospital to this home."

¶ 52       According to the trial court, A.S. "need[ed] permanence." Although understanding that respondent had begun her domestic violence classes, the court found it significant that respondent had "only visited eight times in this child's life. So [it did not] believe that giving parents more time would really make any difference." The court stated that the focus "now shifts away from the parents as to what is best for the minor" and the only home A.S. had known was her foster home.

¶ 53       Accordingly, the trial court found that the State had established by "more than a preponderance of the evidence that it is in the best interest of this minor that the parental rights of [respondent] *** be terminated." The court ordered that DCFS was to "remain as guardian and custodian" and "will have the power to consent to adopt should anyone desire to adopt." A written order was entered that day.

¶ 54       This appeal followed.

¶ 55                                    II. ANALYSIS

¶ 56       On appeal, respondent challenges the trial court's fitness and best-interest findings, claiming they were against the manifest weight of the evidence. Respondent also contends her attorney provided ineffective assistance. We address each contention in turn.

¶ 57       We note, however, that respondent purported to raise certain issues in her "statement of issues" section which were not developed in her actual argument. These issues include her charge of purported racial and ethnic discrimination, socioeconomic discrimination, and due process and equal protections claims. These issues touch on important concerns which this court takes very seriously, but the cursory manner in which they have been raised on appeal fails to demonstrate how they are implicated in this case. It is well settled that issues not supported

by argument and the citation to relevant facts and authorities are deemed forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *Maday v. Township High School District 211*, 2018 IL App (1st) 180294, ¶ 50. We decline to address these issues.

¶ 58                               A. Unfitness Finding

¶ 59          At the fitness portion of the hearing on the termination of parental rights, it is the State's obligation to prove by clear and convincing evidence that the parent is "unfit" under one or more of the grounds provided by section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022); 705 ILCS 405/2-29(2), (4) (West 2022)). *In re Al. P.*, 2017 IL App (4th) 170435, ¶ 40. In reviewing the trial court's decision, we do not retry the case. Instead, we are limited to deciding whether the trial court's finding of unfitness is against the manifest weight of the evidence. *In re J.H.*, 2020 IL App (4th) 200150, ¶ 68. A decision is against the manifest weight of the evidence only if the facts clearly demonstrate that the court should have reached the opposite result. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 33.

¶ 60          In this case, the trial court determined respondent was unfit based upon the State's allegations in its petition to terminate. Specifically, the court determined respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to A.S.'s welfare and that she failed to make both (1) reasonable efforts to correct the conditions that were the basis for the minors' removal from her care and (2) reasonable progress toward the minors' return to her care within separate nine-month periods following adjudication: (i) March 2023 to December 2023 and (ii) May 2023 to February 2024. See 750 ILCS 50/(1)(D)(b), (m)(i)-(ii) (West 2022). Although the court found respondent unfit on several grounds, we need only consider whether any single ground of unfitness was sufficiently proven. See *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006) ("Although section 1(D) of the Adoption Act sets forth numerous grounds under which a parent may be

deemed 'unfit,' any one ground, properly proven, is sufficient to enter a finding of unfitness."); *In re Gwynne P.*, 215 Ill. 2d 340, 349 (2005) ("A parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence.").

¶ 61          1. *Failure to Make Reasonable Progress Towards Return of Child*

¶ 62          Under section 1(D)(m)(ii) of the Adoption Act, a finding of parental unfitness may be based on a parent's failure "to make reasonable progress toward the return of the child to the parent during any [nine]-month period following the [neglect] adjudication." 750 ILCS 50/1(D)(m)(ii) (West 2022). In determining whether reasonable progress has been made, courts should consider only evidence occurring within the relevant nine-month period. *In re J.L.*, 236 Ill. 2d 329, 341 (2010); see *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 72 (stating evidence of the completion of services outside the nine-month time frame is irrelevant to an analysis of unfitness under section 1(D)(m)).

¶ 63          Reasonable progress is an objective standard that exists when the trial court "can conclude that the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, *in the near future*, will be able to order the child returned to parental custody." (Emphasis in original.). *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991). Additionally, our supreme court has stated as follows:

> "[T]he benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001).

¶ 64        Here, the evidence overwhelmingly demonstrates respondent's failure to make reasonable progress during the alleged nine-month time frames. The evidence at the fitness hearing established that A.S. was removed from respondent's care in December 2022, immediately following her birth. Respondent appeared in court for the adjudicatory and dispositional hearings in March 2023 and April 2023 and was admonished regarding the necessity of cooperating with the monitoring agency and complying with the terms of any service plan. The record is replete with examples of respondent failing to cooperate, missing services, and refusing to communicate with her caseworker. Respondent had inconsistent visitation with the minor, meeting with her only eight times since her birth. We conclude that there was ample evidence to support the trial court's determination that respondent failed to establish she made reasonable progress towards the return of A.S.

¶ 65        a. *Respondent's Arguments Regarding Completion of Services*

¶ 66        On appeal, respondent argues that, ultimately, she completed all her required services. However, the record shows the trial court found respondent unfit for failing to make reasonable progress during the relevant nine-month periods that extended from the court's adjudication of neglect. The only service respondent completed during that time frame was parenting, but Powers testified that she had been unable to observe whether respondent was able to implement the lessons from that service because of the limited and inconsistent visits with A.S.

¶ 67        As to the remaining services, the record otherwise showed her substance abuse services were not completed, her mental health services were not completed until April 2024, and she did not begin her domestic violence services until March 2024 (the latter dates being beyond the nine-month periods under consideration). As noted above, when determining whether reasonable progress has been made, courts should consider only evidence occurring within the

relevant nine-month period. *J.L.*, 236 Ill. 2d at 341. Here, the nine-month periods considered by the court involved periods of inaction by respondent and a lack of consistent engagement in her required services.

¶ 68      b. *Respondent's Argument Regarding Barriers to Completing Services*

¶ 69      Respondent asserts that the trial court's findings were against the manifest weight of the evidence because the court ignored the fact that her struggle to engage with the various services was "primarily due to barriers such as transportation and communication difficulties." According to respondent, "parents should not be penalized for failing to meet service plan requirements when those failures stem from external, systemic barriers." She further contends that a parent's failure to engage in services "should not automatically result in a finding of unfitness if the failure is due to factors beyond the parent's control."

¶ 70      In reviewing the record, however, it is apparent that the trial court considered respondent's claim that she had transportation issues, as well as Powers's testimony that she offered respondent gas cards and tickets for train transportation when respondent resided in Missouri. As the court properly observed in its finding, respondent chose to relocate to Missouri, which required her to travel back to Illinois to meet with some of her service providers and spend time with her daughter. We also note that respondent satisfied some of her service requirements while in Missouri. Moreover, there was no evidence as to why respondent could not satisfy the requirements of attending counseling and other services once she returned to Illinois and lived in Springfield. Respondent's transportation issues were addressed through the gas cards and train tickets. She simply did not avail herself of them.

¶ 71      As to communication difficulties, the record simply fails to support the contention that this was an issue below. English was listed as respondent's language. From a review of her

- 17 -

testimony, she demonstrated no difficulty in communicating with counsel or the trial court, as she appeared to understand all of the questions asked and provided answers as to the questions posed. This contention is simply unsupported by the record.

¶ 72    Accordingly, we find nothing to suggest that an opposite result is clearly apparent.

¶ 73    2. *Failure to Maintain a Reasonable Degree of Interest or Concern*

¶ 74    A separate ground for the trial court's finding of unfitness is respondent's failure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare. 750 ILCS 50/1(D)(b) (West 2022); *In re Adoption of Syck*, 138 Ill. 2d 255, 279-80 (1990). "Because the language of section 1(D)(b) of the Adoption Act is in the disjunctive," a court may consider any of the three elements "on its own as a basis for unfitness: the failure to maintain a reasonable degree of interest or concern or responsibility as to the child's welfare." *In re C.E.*, 406 Ill. App. 3d 97, 108 (2010). In making this analysis, a court may consider, among other things, "a parent's efforts to visit and maintain contact with the child, as well as other indicia of interest, such as inquiries into the child's welfare." *Id*. (citing *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006)). Further, a court must examine the parents' conduct in the context of their circumstances. *Id*. "Relevant circumstances include, for example, difficulty in obtaining transportation, the parent's poverty, statements made by others to discourage visitation, and whether the parent's lack of contact with the children can be attributed to a need to cope with personal problems rather than indifference towards them." *Id*. at 109 (citing *In re T.D.*, 268 Ill. App. 3d 239, 246 (1994)).

¶ 75    As the trial court observed, A.S. was born in December 2022; visitation was offered weekly for roughly a year and thereafter offered monthly. Respondent was offered gas cards and train tickets but only availed herself of those opportunities on one occasion. Although she had over 52 opportunities to meet with A.S., she only managed to make it to 8 visits (and even then, she

was sometimes late or left early). Respondent could not explain why she did not visit more often. The record certainly establishes that these missed visits were not due to any external factors, at least not any for which help was not offered. On review, this court affords "[g]reat deference" to the trial court's findings "since the judge had the opportunity to view the witnesses and evaluate the testimony." *In re A.P.*, 277 Ill. App. 3d 592, 598 (1996). We find nothing to show that the trial court's determinations regarding respondent's lack of interest in maintaining a relationship with A.S. were against the manifest weight of the evidence.

¶ 76    Accordingly, we conclude that the trial court's determination that respondent was unfit was not against the manifest weight of the evidence.

¶ 77                    B. Best-Interest Determination

¶ 78    Following a finding of unfitness, the focus shifts to the child. *In re D.T.*, 212 Ill. 2d 347, 364 (2004). "The issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *Id.* Accordingly, at a best-interest hearing, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.*

¶ 79    The determination of whether termination of parental rights serves a minor's best interest relies on the consideration of several factors, including:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with

parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." *Daphnie E.*, 368 Ill. App. 3d at 1072.

See 705 ILCS 405/1-3(4.05)(a)-(j) (West 2022). "The court's best interest determination [need not] contain an explicit reference to each of these factors, and a reviewing court need not rely on any basis used by the trial court below in affirming its decision." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

¶ 80        The State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the minor's best interest. *D.T.*, 212 Ill. 2d at 366. "A reviewing court affords great deference to a trial court's best-interest finding because the trial court is in a superior position to view the witnesses and judge their credibility." *J.B.*, 2019 IL App (4th) 190537, ¶ 33. Consequently, we will not reverse a trial court's best-interest finding and termination of parental rights unless its decision is against the manifest weight of the evidence. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 68.

¶ 81        Here, the record reveals testimony that A.S. is doing well in her foster care placement, adjusting well, and being well cared for by her foster parent. According to Powers, the foster parent is providing for all of A.S.'s emotional and physical needs and reported to be well-bonded with A.S. Moreover, she is willing to adopt A.S. and has signed a permanent commitment form. We find the record contains sufficient evidence to support the trial court's best-interest finding.

¶ 82                                C. Ineffective Assistance

¶ 83        Finally, respondent argues that her trial counsel did not adequately represent her. Specifically, she contends that counsel "did not sufficiently raise the issues of her barriers to

compliance during the trial, which contributed to the court's finding of unfitness." According to respondent, "counsel must advocate for the accommodations necessary to ensure that parents are given a fair opportunity to reunite with their children" and that the "failure to do so prejudiced [respondent]."

¶ 84    "Illinois courts apply the same standard utilized in criminal cases to determine a parent's claim of ineffective assistance of counsel appointed under the Juvenile Court Act." *In re A.P.-M.*, 2018 IL App (4th) 180208, ¶ 39. "To prevail on such a claim, a [respondent] must show that counsel's performance was (1) deficient and (2) prejudicial." *Id.* (citing *People v. Thomas*, 2017 IL App (4th) 150815, ¶ 10). "To establish deficient performance, a [respondent] must show that her attorney's performance fell below an objective standard of reasonableness." *Id.* ¶ 40. Judicial review of counsel's performance is highly deferential. *People v. McGath*, 2017 IL App (4th) 150608, ¶ 38. A respondent must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy. *People v. Manning*, 241 Ill. 2d 319, 327 (2011). "Trial strategy includes decisions such as what matters to object to and when to object." *A.P.-M.*, 2018 IL App (4th) 180208, ¶ 40 (citing *People v. Ramsey*, 2017 IL App (1st) 160977, ¶ 36).

¶ 85    To establish prejudice, the respondent must show that, but for counsel's errors, there is a reasonable probability that the result of the proceeding would have been different. *People v. Houston*, 229 Ill. 2d 1, 4 (2008). A reasonable probability is defined as a probability that undermines confidence in the outcome of the trial. *Id.* Failure to satisfy either prong precludes a finding of ineffective assistance of counsel. *People v. Simpson*, 2015 IL 116512, ¶ 35.

¶ 86    Here, although respondent contends that counsel failed to raise three points—her supposed transportation, communication, and socioeconomic barriers—we note that all three can

be categorized as barriers to respondent's ability to comply with the required service programs. First, the issue of transportation *was* addressed by counsel, and the record shows that the agency offered to provide respondent with gas cards and alternatively, train tickets. Second, as noted above, the record fails to demonstrate any language or communication barrier. Third, although there was some evidence presented that respondent lacked funds and that she was having problems obtaining employment, these factors were considered by the trial court in its findings. There were no other socioeconomic facts presented. Even so, the State provided respondent with free transportation opportunities, but she largely declined to use them.

¶ 87    To succeed on a claim of ineffective assistance of counsel, respondent must show that "but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different." *Houston*, 229 Ill. 2d at 4. Respondent has failed to do so by any standard. Indeed, respondent's appellant brief offers no factual argument on this point beyond raising the general issue. The trial court's ruling was based on its assessment of respondent's conduct and her noncompliance with the various services directives within the various nine-month periods and appeared to be most impacted by respondent's failure to show any interest in her child, as evidenced by having visited her only eight times since her birth in late 2022. Accordingly, we conclude trial counsel was not ineffective.

¶ 88                        III. CONCLUSION

¶ 89    For the reasons stated, we affirm the trial court's judgment.

¶ 90    Affirmed.